*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1295

ANTOINE MAYHAND, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-9023-2013)

(Hon. Stuart G. Nash, Trial Judge)

(Argued February 4, 2015                 Decided July 9, 2015)

*Abram J. Pafford* for appellant.

*Kristina Ament*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, with whom *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Peter C. Lallas*, Assistant United States Attorneys, and *Susan M. Simpson*, Special Assistant United States Attorney, were on the brief, for appellee.

Before FISHER and EASTERLY *Associate Judges*, and RUIZ, *Senior Judge*.

EASTERLY, *Associate Judge*: This case began when Christopher Ballard called 911. In an ensuing seventeen-minute "reasonable conversation" between Mr. Ballard and a 911 operator that the trial court found was "fairly level and

coherent and balanced," but "perhaps mask[ed] . . . [Mr. Ballard's] emotional agitation," Mr. Ballard accused Antoine Mayhand of threatening to stab him. Mr. Mayhand was charged with threats[1] and, because Mr. Ballard was due to testify against Mr. Mayhand's brother in another case, obstruction of justice.[2]

Mr. Ballard did not testify at trial, and the government successfully argued that the entirety of his 911 call was admissible as an excited utterance and present sense impression. This recording was the only evidence the jury heard of Mr. Mayhand's alleged criminal conduct. The jury acquitted Mr. Mayhand of threats but convicted him of obstruction of justice. Mr. Mayhand makes multiple arguments on appeal, but we need only address two: his challenge to the sufficiency of the evidence and his argument that the accusatory portions of Mr. Ballard's 911 call were improperly admitted because they did not fall within the excited utterance exception to the rule against hearsay.[3]

---

[1] D.C. Code § 22-1810 (2012 Repl.).

[2] D.C. Code § 22-722 (a)(4) (2012 Repl.).

[3] Mr. Mayhand also argues that the remainder of the 911 call should not have been admitted as a present sense impression, that the entirety of the call was a testimonial statement that triggered his Sixth Amendment right to confrontation, and that an anti-deadlock instruction given to the jury was coercive.

We conclude that the evidence presented at trial was sufficient to convict Mr. Mayhand of obstruction of justice, but we determine that reversal is required because the evidence of a threat used to obtain that conviction was inadmissible hearsay that should not have been presented to the jury. Specifically, the trial court improperly admitted as excited utterances the parts of Mr. Ballard's 911 call that the government needed to prove obstruction—the statements in which Mr. Ballard calmly reported to the operator that Mr. Mayhand had, at some unspecified prior time, threatened to stab him. Mr. Ballard's out-of-court accusations fail all three elements of our test for the admission of excited utterances and fall well outside the bounds of this limited exception to the rule against hearsay.

Again, we issue words of caution regarding the limited scope of this exception, which "is designed to protect litigants from judgments based on unreliable second-hand evidence which is not subject to cross-examination." *Odemns v. United States*, 901 A.2d 770, 777 (D.C. 2006). Our restrictions on the use of hearsay are no more to be avoided by determinations that the declarant who appeared outwardly calm suffered hidden inner turmoil than by "rote recitations that the declarant was upset or excited or afraid." *See id.* In other words, a statement is not an excited utterance unless the declarant is manifestly overcome by excitement or in shock. Moreover, the contemporaneousness of the statement

with the exciting event and the related "critical requirement of spontaneity," *id.*, must be given equal and careful consideration. Lastly, the totality of the circumstances must be scrutinized for indicia of self-awareness and reflection that are inconsistent with the "immediate and uncontrolled domination of the senses" necessary to establish an excited utterance. *Id.* at 778 (quoting *Alston v. United States*, 462 A.2d 1122, 1126 (D.C. 1983)).

## I.    Facts

The foundation of the government's case was the 911 call Mr. Ballard placed on the morning of May 28, 2013. A recording of the call was made available to this court as part of the record. The government also provided this court with a transcript,[4] which we have attached to this opinion as Appendix A.

The 911 call lasted seventeen minutes and included four specific assertions by Mr. Ballard that, at some unspecified earlier point in time, Mr. Mayhand had threatened to stab him. The statements are: (1) at minute 1:22, "[h]e said he was going to pull a knife on me, and stab me"; (2) at minute 2:11, "[h]e said, 'I should

---

[4] The transcript was prepared by the government, but appellant does not object to its contents.

pull a knife on you and stab your bitch ass'"; (3) at minute 2:27, in response to a question from the operator asking where the knife was: "I have no idea, he said I should pull this knife on you . . ."; and, (4) at minute 6:15, "[n]o, I have not seen any weapons, but he said, 'I should pull a knife on you and stab your bitch ass.'"

The remainder of the call is a narration of Mr. Ballard's walk from Ivory Walters Lane to the Denny's on Benning Road, a distance of about ten blocks, apparently with Mr. Mayhand in close proximity. Interspersed between updates on his location, Mr. Ballard gives the 911 operator descriptions of himself and of Mr. Mayhand, as well as explanations of his involvement in the case against Mr. Mayhand's brother. The recording also includes long periods of silence, some lasting over a minute. A few times, Mr. Ballard can be heard shouting angrily at someone, presumably Mr. Mayhand. At one point, Mr. Ballard tells the operator that Mr. Mayhand is "charging" him, and then shouts, "[t]hat's why he's gonna do fifteen years! The police is on the line, what you gonna do? Bring it on!" But nothing appears to come of the "charging"; Mr. Ballard immediately provides another update on his location and informs the operator that Mr. Mayhand is "just standing there looking at me now." The call ultimately terminates after the police arrive and Mr. Ballard is heard making contact with them.

The police arrested Mr. Mayhand, and he was charged with threats and obstruction of justice. Prior to trial, the government moved for a ruling on the admissibility of the recording of Mr. Ballard's 911 call. Over the defense's objection, the court ruled that the government could play the entire call for the jury. The court reasoned that "the bulk of it is a present sense impression" and that "[t]he only part that does not get swept into that is the assertion about the threat that had happened previous to the call." But the court determined that "those portions of the call can come in under the excited utterance exception to the hearsay rule."

The court explained:

> People do get—well, certainly, as I said earlier, if someone threatens to stab you with a knife and then follows you for a period of blocks down the street; that is an event that a reasonable person would—that a reasonable person would find to be an exciting event that would put them into a state of emotional agitation. So that element I believe is satisfied.
>
> The question is whether in this particular case Mr. Ballard was put into—was, in fact, put into such a state of emotional agitation. And I do find that he was. It is true that his conversation with the 911 operator is fairly level and coherent and balanced. He's certainly not a hysteric, screaming into the phone. Over a period of time, engages in a reasonable conversation with the operator. But people exhibit their emotional agitation in different

ways. Not everyone gets hysterical. It does seem to me that there is strain in his voice throughout the call. Certainly he was concerned enough about the threat that he did call the police and remained on the police—or the entire 17 minutes it took for them to dispatch someone to come to get him.

And I think most importantly, there are times during those 17 minutes when apparently there is an exchange between [Mr.] Ballard and [Mr.] Mayhand where he is screaming at [Mr.] Mayhand. Clearly on those parts of the call, he is emotionally agitated when he's screaming at [Mr.] Mayhand. But immediately after engaging in this, he goes into the same conversational pattern with the operator, goes back to his reasonable tone of voice. And so it seems to me that he is making an effort to be understood by the operator, to talk reasonably with the operator and that is perhaps masking the submission of his emotional agitation. He has the ability to do that. But I do find that the agitation existed and was certainly corroborated then by the observations of the officers when he comes on the scene, that being in his—his head is or his neck is pulsating and that he's sweating profusely, and that he articulates concern for his life based on his interaction with Mr. Mayhand. So I do find that throughout the call, while it's not immediately apparent from the conversational pattern of the participants that [Mr.] Ballard was suffering from an emotional agitation.

And I addressed temporal aspect earlier[5] which is that in my mind it's not just the threat, but it's the threat and the

---

[5] The court had earlier preliminarily observed that

the temporal element is satisfied because it's not just the threat that would excite a state of nervous excitement in the hearer.  It is also being threatened and then being followed down the street.  And so in that sense, I think,

(continued…)

following down the street that causes the emotional agitation and that's an ongoing stimulus that was sufficient to make, in my mind, the entire 911 call an excited utterance.

Aside from the recording of Mr. Ballard's 911 call, the only other evidence presented by the government at trial was the testimony of Officer Stephen Chih, one of the police officers who responded to the 911 call.  Officer Chih testified that when he first arrived on the scene, Mr. Mayhand and Mr. Ballard were standing "15, 20 feet" apart.  Because Mr. Mayhand matched the description provided to Officer Chih by the dispatcher, Officer Chih detained him.  According to Officer Chih, Mr. Mayhand responded by "yell[ing] some expletives," calling Mr. Ballard a "snitch," and denying having done "anything [Mr. Ballard] said that I did."  Officer Chih then interviewed Mr. Ballard, who was "trembling," had "beads of sweat on his face," was "constantly looking over his shoulder," was breathing "quick[ly]," and had a visible "vein along his neck . . . pulsating very quickly."

Based on this evidence, a jury convicted Mr. Mayhand of obstruction of justice and acquitted him of making threats.  This appeal followed.

---

(…continued)
there's an ongoing event that would reasonably engender a nervous excitement on the part of the victim.  So the temporal element, I believe, is satisfied.

## II. Analysis

### A. The Sufficiency of the Evidence to Support Mr. Mayhand's Conviction for Obstruction of Justice

We first examine the sufficiency of the evidence and determine that, when considering the improperly admitted 911 call, as we must,[6] there was sufficient evidence to support Mr. Mayhand's conviction for obstruction of justice.

When a defendant challenges the sufficiency of the evidence, we "assess the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Harrison v. United States*, 60 A.3d 1155, 1161 (D.C. 2012) (quoting *Campos-Alvarez v. United States*, 16 A.3d 954, 964 (D.C. 2011)). We reverse a conviction for insufficiency "only where there is no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Id*.

Mr. Mayhand argues that the government failed to prove a "nexus" between the threats he allegedly made towards Mr. Ballard and any intent to prevent Mr.

---

[6] *See Thomas v. United States*, 557 A.2d 599, 601 (D.C. 1989) (en banc) (per curiam).

Ballard "from testifying at the trial of Mr. Mayhand's brother." The crime of obstruction does not require the government to present such proof, however. As defined by D.C. Code § 22-722 (a)(4), the crime of obstruction is committed when a defendant "[i]njures or threatens to injure any person . . . on account of the person . . . giving to a criminal investigator in the course of any criminal investigation information related to a violation of any criminal statute in" the D.C. Code. The recording of the 911 call, in conjunction with testimony from Officer Chih that Mr. Mayhand had called Mr. Ballard a "snitch," a derogatory term for a witness for the government, provided a sufficient basis for a reasonable fact-finder to infer that Mr. Mayhand had threatened to injure Mr. Ballard and had done so "on account of" the information Mr. Ballard gave to law enforcement during the investigation of Mr. Mayhand's brother.

The more troubling question is whether the government should have been permitted to make the 911 recording the evidentiary core of its case. We turn to that question now.

**B.** **The Admissibility of the Accusatory Portions of the 911 Call as Excited Utterances**

We focus on the admissibility of the accusatory portions of the 911 call—the portions in which Mr. Ballard told the 911 operator that Mr. Mayhand had threatened to pull a knife on him. If these statements were not admissible as excited utterances, then it would not matter if the remainder of the seventeen-minute 911 call were properly admitted as an excited utterance or a non-reflective, present sense impression.[7] Excised of Mr. Ballard's report of Mr. Mayhand's alleged threat, the call would have been of little use to the government.

The test for admitting an out-of-court statement offered for the truth of the matter asserted under the "excited utterance" exception to the rule against hearsay is well established in this jurisdiction and has three parts. The proponent of the statement must establish:

> (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably

---

[7] *See Hallums v. United States*, 841 A.2d 1270, 1277 (D.C. 2004) (per curiam) ("[S]tatements of present sense impression are considered reliable because the immediacy eliminates the concern for lack of memory and precludes time for intentional deception.").

> short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

*Odemns*, 901 A.2d at 776. "In all cases the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event." *In re L.L.*, 974 A.2d 859, 865 (D.C. 2009) (quoting *Price v. United States*, 545 A.2d 1219, 1227 (D.C. 1988)).

Whether a statement constitutes an excited utterance "depends upon the facts peculiar to each case," *Lewis v. United States*, 938 A.2d 771, 775 (D.C. 2007), and each element of the three-part test "must be met" before such a statement may be admitted into evidence. *See Melendez v. United States,* 26 A.3d 234, 245 (D.C. 2011). The trial court "has the legal responsibility to examine the testimony and determine whether the proper foundation has been laid" before deciding whether the exception applies. *Castillo v. United States*, 75 A.3d 157, 162 (D.C. 2013) (internal quotation marks omitted). We commit this decision to the trial court's "exercise of sound judicial discretion." *Odemns*, 901 A.2d at 776 (quoting *Nicholson v. United States*, 368 A.2d 561, 564 (D.C. 1977)). Accordingly, we review the trial court's fact-finding for clear error, and we review the court's

determination that these facts permit admission of a statement under the excited utterance exception for abuse of discretion. *Id. See also Castillo*, 75 A.3d at 162. Obviously, whether the trial court adheres to the test for the admission of hearsay under this exception is a legal question and the trial court abuses its discretion when it "rests its conclusions on incorrect legal standards." *Castillo*, 75 A.3d at 162 (quoting *In re J.D.C.*, 594 A.2d 70, 75 (D.C. 1991)). *See also Simmons v. United States*, 945 A.2d 1183, 1187 (D.C. 2008) (stating that "[a] discretionary ruling founded on a mistake of law" is "by definition" incorrect).[8]

---

[8] The government cites *(Martin A.) Brown v. United States*, 27 A.3d 127 (D.C. 2011) (quoting *Dutch v. United States*, 997 A.2d 685 (D.C. 2010)), for the proposition that we "afford[] de novo review" to the question of whether a statement qualifies as an excited utterance. It is far from clear to us that this court in *Brown*, by quoting *Dutch* (a case addressing the business record exception to the rule against hearsay), meant to depart from a long line of precedent endorsing review for abuse of discretion of the admission of hearsay under the excited utterance exception. Indeed, *Brown* also quotes a passage from *Odemns* explicitly endorsing review for abuse of discretion. *Id*. at 130-31. With that said, our review for abuse of discretion does incorporate a de novo element to the extent that we are considering conclusions of law encompassed in the trial court's ruling, i.e., its formulation of the three elements of this hearsay exception.

1.      *Nervous excitement or physical shock*

The first question for the trial court was whether Mr. Ballard had experienced an exciting event that "generated a state of nervous excitement or physical shock in the declarant." *Odemns*, 901 A.2d at 776. The court determined that being threatened and then followed by the individual who had issued the threat would be "an exciting event that would put [a reasonable person] into a state of emotional agitation";[9] the question in the court's view was "whether in this particular case Mr. Ballard was . . . in fact put into such a state of emotional agitation." It determined that he was, even though all outward signs indicated to the contrary. In so doing, the court misapplied the first element of the excited utterance test.

---

[9]    The court did not consider whether the uncorroborated out-of-court statement proffered as an excited utterance could serve as the sole proof that an exciting event had occurred. *But see United States v. Woodfolk*, 656 A.2d 1145, 1150 (D.C. 1995) (assuming that such bootstrapping would not be permitted and that some corroborating evidence would be required)*; Brown v. United States*, 152 F.2d 138, 140 (D.C. Cir. 1945) ("This exception to the hearsay rule has commonly been applied only when there has been independent evidence of an exciting event."). We need not address this issue, as we determine that other elements of the excited utterance test were not met.

The trial court determined that Mr. Ballard was in a state of "emotional agitation," even as it acknowledged that Mr. Ballard's "conversation with the 911 operator [wa]s fairly level and coherent and balanced"; that Mr. Ballard was "certainly not a hysteric, screaming into the phone"; and that Mr. Ballard, "[o]ver a period of time, engage[d] in a reasonable conversation with the operator." Indeed, the trial court found that Mr. Ballard was able to control his emotions: after "screaming at [Mr.] Mayhand," he had the "ability" to resume "his conversational pattern with the operator" and "go[] back to his reasonable tone of voice." Having ourselves listened to the recording of the 911 call, we concur with the court's factual findings regarding Mr. Ballard's outward emotional state. Those findings, however, do not support a determination that Mr. Ballard was experiencing the necessary "nervous excitement or physical shock," *Odemns*, 901 A.2d at 776, to support admission of his statements under the excited utterance exception to the rule against hearsay.

The essential rationale of this hearsay exception is that statements made while a person is overcome by excitement or in shock are fundamentally trustworthy. The theory at least is that the wash of excitement blocks the reflection and calculation that could produce false statements:

> [A] person making an exclamation or a statement while under the influence of the excitement or shock caused by witnessing or participating in an extraordinary event, such as a murder or a serious accident, is unlikely to fabricate an untruth, but, on the contrary, has a tendency to disclose what is actually on his mind. The mental stress and nervous strain preclude deliberation and bar reflection. Declarations made while the spell endures are uncontrolled. *They are practically reflex actions and may be said to be verbal photographs or images of the contents of the brain.* Such utterances are likely to be made without any calculation as to their potential effect and without regard to their possible consequences. They are apt to be the truth as the person knows it. Consequently, it is safe to accept testimony as to expressions of this type, even in the absence of an opportunity to cross-examine the person who gave vent to them. *These considerations form the underlying reason for this exception to the hearsay rule.*

*Odemns*, 901 A.2d at 778 n.6 (emphases in original).[10] *See also Alston*, 462 A.2d at 1126 ("Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the

---

[10] As we acknowledged in *Odemns*, 901 A.2d at 778 n.7, "the entire basis for the [excited utterance] exception is, of course, subject to question" in light of studies showing that heightened levels of stress may impede accurate perception and recall. *See id.* ("While psychologists would probably concede that excitement minimizes the possibility of reflective self-interest . . . , they have questioned whether this might be outweighed by the distorting effect of shock and excitement."); *Hallums*, 841 A.2d at 1276 (noting that "a state of excitement may impair the accuracy of the declarant's power of observation").

utterance may be taken as particularly trustworthy." (quoting *Beausoliel v. United States*, 107 F.2d 292, 294 (D.C. Cir. 1939))); FED. R. EVID. 803 (1), (2) advisory committee note ("[C]ircumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.").[11]

The trial court's findings regarding Mr. Ballard's "reasonable" demeanor while speaking to the 911 operator establish that Mr. Ballard did not experience this sort of suspension of cognitive function in his seventeen-minute telephone call with the 911 operator. *See Alston*, 462 A.2d at 1127 ("[W]hen the declaration consists of a calm narrative of a past event, it loses the character of a spontaneous utterance."). *Cf. Odemns*, 901 A.2d at 777 (stating that the excited utterance exception is meant "to apply to situations in which the declarant was so excited by the precipitating event that he or she was still under the spell of its effect" at the time of speaking) (internal quotation marks omitted).

---

[11]  We have previously relied on the Federal Rules' explanation of the excited utterance exception as a basis for our use of the same. *See Brisbon v. United States*, 894 A.2d 1121, 1126 n.15 (D.C. 2006); *Reyes-Contreras v. United States*, 719 A.2d 503, 507 (D.C. 1998); *Smith v. United States*, 666 A.2d 1216, 1221 n.7 (D.C. 1995). *Cf. Hallums*, 841 A.2d at 1276 (relying on the official comment to FED. R. EVID. 803 (1) and (2) (present sense impressions and excited utterances, respectively) to justify adopting the exception for present sense impressions).

We acknowledge the court's finding that it detected "strain" in Mr. Ballard's voice, but mere vocal strain or indication of some anxiety is insufficient in this context. Again, because our aim is to ensure that an individual's powers of reflection have been suspended, we require a much higher level of emotional upset to support the admissibility of a hearsay statement as an excited utterance. *Alston*, 462 A.2d at 1127 (stating that only when "there is evidence that the declarant was highly distraught and in shock at the time the statement was uttered, [is] an adequate showing as to the first element . . . made"). *Accord. Castillo*, 75 A.3d at 161-63 (first prong satisfied where declarant was "really upset" and "pacing around and screaming"); *Melendez*, 26 A.3d at 245 (declarant was "very scared, excited, nervous, and cold, tired, very shocked, greenish, and "very upset") (internal quotation marks omitted); *Teasley v. United States*, 899 A.2d 124, 128-29 (D.C. 2006) (declarant "spoke in an excited tone, mumbled to himself, and didn't have the wherewithal to provide his license plate number") (internal quotation marks omitted); *Bryant v. United States*, 859 A.2d 1093, 1100 (D.C. 2004) (declarant was "crying, shaking and very distraught").[12]

---

[12] The court also looked to the fact that Mr. Ballard was "concerned enough about the threat" to remain on the phone for seventeen minutes as evidence that Mr. Ballard was experiencing the requisite "emotional agitation," but that rational action itself reflects deliberative thought, not an "immediate and uncontrolled domination of the senses," *Alston*, 462 A.2d at 1126, or a "reflexive response to a traumatic event." *Clarke v. United States*, 943 A.2d 555, 558 (D.C. 2008).

Nor did the trial court's reliance on Mr. Ballard's after-the-fact excitement when speaking to Officer Chih fill the evidentiary gap. Even where we have determined that a declarant actually made initial statements under the influence of excitement or shock, we have declined to extend the excited utterance exception to later emotional retellings of the stressful incident. As we explained in *In re L.L.*, "[t]here is a difference between the stress or excitement caused by the original event and that caused by the trauma of having to retell what happened after initially calming down. Only the former is admissible as an excited utterance." 974 A.2d at 864 (internal quotation marks omitted). Certainly where, as here, Mr. Ballard was not initially overcome by excitement and was not in shock, the fact that he later became excited and distraught when he met with the officers who had been dispatched to his aid is immaterial; his subsequent demeanor cannot relate back to his earlier "rational," "balanced," "reasonable" statements and infuse them with that same excitement.

In fact, the court appeared to recognize that the evidence of Mr. Ballard's outward demeanor, at the time he made his accusatory statements, was insufficient. It thus determined that Mr. Ballard was "perhaps masking . . . his emotional agitation" such that it was "not immediately apparent from the conversational pattern of the participants that [Mr.] Ballard was suffering from an emotional

agitation." But to the extent the court relied on its assessment that Mr. Ballard was "masking" his excitement, the court misconstrued this first element of the excited utterance test.

An individual who is "under the immediate and uncontrolled domination of the senses," *see Alston*, 462 A.2d at 1126, should not be able to "mask" or otherwise control his emotional state. Indeed, the exercise of such control is precisely the type of deliberative cognitive function that the first element of the test for the admission of excited utterances is supposed to screen out. Thus, by determining that a declarant of an excited utterance may "mask" the very symptoms that we require to justify the admission of a statement under this hearsay exception, the court effectively negated the first element of the excited utterance test.

Because there was no indication that Mr. Ballard was actually "distraught, in shock, or in a state of nervous excitement at the time" he made his accusatory statements to the 911 operator, the trial court "had no basis, in the existing evidence, to find that the first element [of the excited utterance exception] had been satisfied." *Walker v. United States*, 630 A.2d 658, 666 (D.C. 1993).

2.      *Contemporaneity and spontaneity*

Turning to the second element of the excited utterance exception—that the statement be made "within a reasonably short period of time after the occurrence, so as to ensure that the declarant had not had time to reflect on the statement or premeditate or construct it," *Odemns*, 901 A.2d at 776—we determine that the court's findings were both insufficient and unsupported by the record.

The contemporaneity and spontaneity element of the excited utterance test, though "not controlling, . . . *is of great significance.*"  *Castillo*, 75 A.3d at 164 (emphasis in original) (quoting *Odemns*, 901 A.2d at 778).  Like the "nervous excitement or physical shock" element, it serves as reassurance that the declarant could not reflect or deliberate before speaking.  *Clarke*, 943 A.2d at 558 (explaining that "the earmarks of an excited utterance" are "spontaneity, lack of reflection or forethought, [and] a reflexive response to a traumatic event"); *Smith*, 666 A.2d at 1223 ("The critical factor is that the declaration was made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it.") (internal quotation marks omitted).  The analysis of this element is fact-specific, and "[t]he seriousness of the startling event is relevant to the determination of

whether the utterance occurred within a reasonably short period of time . . . ." *See Castillo*, 75 A.3d at 165. Although a highly shocking, violent, or serious event can have a more lasting emotional effect, the law generally requires an excited utterance to be more or less contemporaneous with the event that induced the excitement. *See Odemns*, 901 A.2d at 779-81.[13]

The trial court needed to make a finding about the contemporaneity and spontaneity of Mr. Ballard's statement vis-à-vis the source of his stimulus. And to do that, it needed to make a specific finding about the timing of the alleged threat itself. But it did not do this. Rather, it appeared to assume that the alleged threat closely preceded the 911 call and then found that the alleged following, in conjunction with the recent threat, created an "ongoing" exciting event.

The trial court's analysis is problematic for a number of reasons. To begin with, there is no evidence in the record about when the alleged threats had actually occurred, or how much time had passed before Mr. Ballard called 911. Although

---

[13] Both the hearsay exception for present sense impressions and excited utterances require a showing of spontaneity, *see* FED. R. EVID. 803 (1), (2) advisory committee note (explaining that "[s]pontaneity is the key factor" for both present sense impressions and excited utterances), but we allow a bit more temporal flexibility with the latter exception, relying on the emotional element to "still[] the capacity of reflection." *Id.*

Mr. Ballard repeated Mr. Mayhand's threat to the 911 operator several times and gave the operator a variety of other information, he never indicated when or where Mr. Mayhand had allegedly threatened him.[14] There having been no evidence presented as to when the initial stimulus occurred, the court's determination that Mr. Mayhand's continued presence during the 911 call was a source of "ongoing stimulus" lacks foundation. Even assuming from the fact of the call that the alleged threat had occurred immediately prior, Mr. Mayhand's demeanor disproved that the alleged threat in conjunction with Mr. Mayhand's continued proximity served as an "ongoing stimulus," at least in the sense required for an excited utterance, and should not have negated any temporal concerns. To be sure, more than two minutes into the call, Mr. Ballard noted that Mr. Mayhand was following him. But he provided this information matter-of-factly, and when asked whether he was able to get himself to safety, he responded that he was "on a public street," suggesting that he felt no need to seek shelter. And in fact, he did not. He continued his ten-block walk to the Denny's on Benning Road, and he continued his mostly calm conversation with the 911 operator.

---

[14] At the end of the 911 call, Mr. Ballard is heard telling the officers who responded that "[t]his man right here *just now* threatened me." But, of course, given that Mr. Ballard had just spent seventeen minutes on the phone with the 911 operator, the assertion that Mr. Mayhand had "just now" threatened Mr. Ballard cannot be literally interpreted.

In its brief, the government concedes that there is no evidence in the record as to when the alleged threat occurred, but it argues that, based on Mr. Mayhand's testimony that he got up around 6:45 a.m. and the fact Mr. Ballard's call was made at 7:14 a.m., the alleged "threat against Ballard could not have been made more than 30 minutes before Ballard's 911 call." The government further argues that this limited window of time was "sufficient to support the admission of the 911 call as an excited utterance." But this court does not analyze excited utterances in such a categorical manner. There is no standard thirty-minute grace period for the admission of excited utterances.[15] Rather we must consider the particular facts of this case.

Here, even if we assume that Mr. Ballard had an excitement-inducing encounter with Mr. Mayhand just before he called 911, his calm demeanor on the call, *see supra* at II.B.1, and his deliberate responses to questioning by the 911

---

[15] In support of its argument that the alleged threat was close enough in time to Mr. Ballard's 911 call, the government cites to other cases where we stated that statements made within a half hour of a disturbing event were admissible. But in those cases the declarants not only experienced arguably more disturbing events than the receipt of a verbal threat, but also were, unlike Mr. Ballard, actually traumatized. *See, e.g., Teasley*, 899 A.2d at 128 n.3 (carjacking at gunpoint); *Reyes-Contreras*, 719 A.2d at 505 (declarant had been punched "repeatedly" by her husband); *Young v. United States*, 391 A.2d 248, 250-51 (D.C. 1978) (declarant had been fatally stabbed).

operator indicate that the intensity of any agitation he may have felt from his alleged encounter with Mr. Mayhand was not lasting and did not prompt spontaneous statements. Mr. Ballard did not excitedly blurt out that he had been threatened as soon as he connected with the 911 operator. He first answered the operator's preliminary inquiries for his name and location. Almost a minute and a half passed before Mr. Ballard told the operator that Mr. Mayhand had "said he was going to pull a knife on me, and stab me."[16]

A statement is not automatically disqualified from admission as an excited utterance simply because it is made in response to questioning; however, a court's analysis must take into account the circumstances in which the statement is made. *See Reyes v. United States*, 933 A.2d 785, 791 (D.C. 2007) ("The key inquiry is whether the interview conducted was more deliberative in nature than spontaneous.") (internal quotation marks omitted)). If the declarant is still "under the spell of the startling event," a response to a government agent's question may yet qualify as an excited utterance. *Id.* But if, as here, the questions produce deliberative and thoughtful answers, then the necessary element of spontaneity and

---

[16] As he repeated this accusation at later points in the conversation (two minutes into the call and then again six minutes into the call), the time between the alleged threat and his report of the threat only grew.

non-reflection is missing. *Id.* *See also Odemns*, 901 A.2d at 779 (finding a lack of spontaneity where there was "no evidence that the declarant [when speaking to the police] shrieked out her account, that she had lost her self-control, or that she was unable to think or reflect. Rather, shaken and upset as she undoubtedly was, she gave evidently responsive and rational answers to the detective's questions").

We thus conclude that the court had insufficient basis for its finding that the statements alleging Mr. Mayhand's prior threats were made spontaneously and within a reasonably short time of a startling event.

### 3. *The totality of the circumstances*

The third and final element of the test for the admission of a hearsay statement under the excited utterance exception is an assessment of whether the "circumstances . . . in their totality suggest spontaneity and sincerity of the remark." *Odemns*, 901 A.2d at 776. The trial court did not address this element explicitly or implicitly, *but see Melendez*, 26 A.3d at 245 (all "three elements must be met" before an excited utterance may be admitted); but had the court done so, this element could not have weighed in favor of admission of Mr. Ballard's statement.

Apart from the fact that Mr. Ballard did not appear to be overcome by excitement or in shock and that his proffered statement was neither contemporaneous with a sufficiently exciting event nor spontaneous, any analysis of the totality of the circumstances must take into account Mr. Ballard's apparent anger at Mr. Mayhand and his awareness that he was on the telephone, with the police, reporting a crime. This was not a situation where the police, summoned by a third party, arrived at the scene and encountered an individual wholly undone by a traumatic incident.[17] Here, Mr. Ballard had the wherewithal to call the police, not merely to ask for help, but to document Mr. Mayhand's criminal behavior and to identify him to the police. He responded "reasonably" to all of the operator's questions for information about Mr. Mayhand and made sure to repeat Mr. Mayhand's threat multiple times. He remained on the line with the 911 operator for seventeen minutes, and, in the midst of this conversation, he directed outbursts at Mr. Mayhand, at one point yelling, "[t]he police is on the line, what you gonna do?" This self-awareness is the antithesis of the mental state required to support a

---

[17] *See, e.g.*, *Smith*, 26 A.3d at 256 (where third party called 911, stabbing victim's statement to detective dispatched to the scene was an excited utterance); *Lewis*, 938 A.2d at 774 (statement was an excited utterance when made by injured and bloodied woman who the police encountered on the scene and who was very emotional and very upset). *Cf. Brown*, 27 A.3d at 129, 134 (statements presumed to be spontaneous where declarant, who had been badly beaten, leaving his head "busted open," was unable to "use the telephone receiver that was in his hand to dial 911 or otherwise call for help").

determination that the declarant's out-of-court statements were excited utterances. Accordingly, we determine that the totality of the circumstances, like the first two elements of the test for an excited utterance, do not support admission of Mr. Ballard's accusatory statements as spontaneous and non-reflective expressions of the truth.

### 4.    *Harm*

As the government proved none of the elements necessary to establish that Mr. Ballard's hearsay accusations were excited utterances, the trial court could not reasonably have deemed these statements admissible under this exception to the rule against hearsay.  But that determination is only the first step of the abuse of discretion inquiry.  "[W]hen reviewing a trial court's exercise of discretion," this court "must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries are answered in the affirmative that we hold that the trial court 'abused' its discretion."  *Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979).  To assess the impact of the court's incorrect ruling, we apply the test for

nonconstitutional harmless error under the *Kotteakos*[18] standard. *See Odemns*, 901 A.2d at 781-82. It is the government's burden to show any error was harmless. *See Robles v. United States*, 50 A.3d 490, 495-96 (D.C. 2012); *Hobbs v. United States*, 18 A.3d 796, 801 (D.C. 2011).

The government has not made any argument that the admission of Mr. Ballard's hearsay was harmless. In any event, where this hearsay was the entirety of the government's evidence that Mr. Mayhand had threatened Mr. Ballard, the only conclusion we can draw is that the jury's judgment was substantially swayed by the admission of this evidence.

Accordingly, we conclude that the trial court abused its discretion when it admitted Mr. Ballard's accusatory statements in his conversation with the 911 operator. Mr. Mayhand's conviction must therefore be reversed.

*So ordered*.

---

[18] *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946) (allowing a court to conclude an error was harmless if, "after pondering all that happened without stripping the erroneous action from the whole, . . . the judgment was *not* substantially swayed by the error.").

# APPENDIX A

## BRIEF FOR APPELLEE

----------------

## DISTRICT OF COLUMBIA
## COURT OF APPEALS

----------------

No. 13-CF-1295

----------------

ANTOINE MAYHAND,                                        Appellant,

    v.

UNITED STATES OF AMERICA,                              Appellee.

---

## APPELLEE'S UNOFFICIAL TRANSCRIPT OF CHRISTOPHER BALLARD'S 911 CALL, MAY 28, 2013

---

**Operator:**    Officer Unified Communications, D.C. 911 (0:01).

**Ballard:**    I need the police (0:03).

**Operator:**    This is operator number 7930 (0:04).

**Ballard:**    Ivory Street (0:07).

**Operator:**    Repeat the location for the recorded line please (0:10).

**Ballard:**    Ivory Walters and G Street, southeast (0:12).

[ . . . ]

**Operator:**    Ivory Walters Lane? (0:34.)

**Ballard:**    Yeah (0:35).

[ . . . ]

1

| | |
|---|---|
| **Operator:** | What's your name? (0:51.) |
| **Ballard:** | Christopher McKay Ballard. I'm on Benning Road and G Street now. (0:54.) |
| **Operator:** | Okay you're at this location now, correct? (1:12.) |
| **Ballard:** | Mhhmm (1:14). |
| **Operator:** | You said someone was harassing you? (1:15.) |
| **Ballard:** | Yes (1:17). |
| **Operator:** | Any weapons involved, or mentioned? (1:19.) |
| **Ballard:** | He said he was going to pull a knife on me, and stab me (1:22). |
| **Operator:** | Do you know this person? (1:26.) |
| **Ballard:** | His name is Antoine Jack– Antoine Smith. He has on a black jacket and a Muslim kufi. (1:28.) |
| **Operator:** | Okay... A- a what now? (1:43.) |
| **Ballard:** | A black jacket and a muslim kufi (1:45). |
| **Operator:** | Black jacket and a – okay (1:48). |
| **Ballard:** | With a grey... (1:49). |
| **Operator:** | Oh, okay. How old is he? (1:50.) |
| **Ballard:** | I don't have no idea how old he is (1:54). |
| **Operator:** | Okay, what do you have on? Are you white, black, Hispanic? (1:58.) |
| **Ballard:** | I'm a black male, with a black ja– with blue jeans (2:00). |
| **Operator:** | Where is the - where is the knife he threatened to harm you with? (2:07.) |
| **Ballard:** | He said, "I should pull a knife on you and stab your bitch ass" (2:11). |
| **Operator:** | Okay, your information has been sent to the radio. Now where's the knife now? (2:22.) |

| | |
|---|---|
| **Ballard:** | I have no idea, he said I should pull this knife on you and... (2:27). |
| **Operator:** | Oh, he *should*, okay, so your – the weapon hasn't not been seen yet – (2:30). |
| **Ballard:** | That's correct (2:32). |
| **Operator:** | Yes sir. Okay, are you in any immediate danger? (2:34.) |
| **Ballard:** | He's following me down the street (2:39). |
| **Operator:** | All right. I'm going to stay on the line with you. Are you able to get yourself to safety? (2:42.) |
| **Ballard:** | I'm on a public street, I'm on Benning Road right now about – uh – what's the... (2:47.) |
| **Operator:** | Okay. Help is being dispatched to that location, help is on the way, just to let you know. Stay on the line. Is anyone else in immediate danger, sir? (2:59.) |
| **Ballard:** | No, ma'am (3:14). |
| **Operator:** | Okay. Stay on the line. (3:16.) |
| **Ballard:** | He has on a black jacket with grey shorts and, um – (3:26). |
| **Operator:** | How old does he appear to be? (3:35.) |
| **Ballard:** | Um, forti— in his . . . late thirties, he has a beard (3:40). |
| **Operator:** | Okay, what's his name again – what's his name again? (4:00.) |
| **Ballard:** | [*indecipherable*] Antoine Smith (4:09). |
| **Operator:** | All right, once again . . . Help has been dispatched to that location. Are you still at that location, sir? (4:14.) |
| **Ballard:** | Right now, I'm at Benning Road and E Street. He's still following me. (4:22.) |
| **Operator:** | Okay, and where – he's on foot, correct? Which direction are you headed in? (4:56.) |
| **Ballard:** | I'm walking towards the police station (5:00). |

| | |
|---|---|
| **Operator:** | So which police station? (5:02.) |
| **Ballard:** | The Sixth District (5:04). |
| **Operator:** | The number Five? (5:06.) |
| **Ballard:** | The Sixth District (5:10). |
| **Operator:** | Oh, the Sixth District. So wait, what street are you on now? (5:11.) |
| **Ballard:** | Benning Road (5:16). |
| **Operator:** | All right, help is being dispatched. I'm going to stay on the line with you, okay? (5:30.) |
| **Ballard:** | Okay (5:36). |
| **Operator:** | What are you wearing? (5:38.) |
| **Ballard:** | A black zip-up jacket, blue jeans, and black - black shoes (5:43). |
| **Operator:** | How old are you sir? (6:01.) |
| **Ballard:** | Thirty-seven. He's still following me, on the other side of the street. (6:05.) |
| **Operator:** | Okay, I did let the dispatcher know, but I'm going to stay on the line with you. Do you see any weapons? (6:07.) |
| **Ballard:** | No, I have not seen any weapons, but he said, "I should pull a knife on you and stab your bitch ass." I had his brother locked up for shooting at me. (6:15.) |
| **Operator:** | Okay, let me know when you see officers at that location, or when MPD arrives at that location (6:54). |
| **Ballard:** | All right (7:08). |
| **Operator:** | And you're on Benning Road now? (7:25.) |
| **Ballard:** | Yes, I'm on Benning Road and C Street now, and he's still following me (7:27). |
| **Operator:** | Let me know when you see the officer, okay? (7:42.) |
| **Ballard:** | Mhhmm (7:47). |

4

| | |
|---|---|
| **Ballard:** | I do not see no officers (8:13). |
| **Operator:** | You do not see the officer? (8:15.) |
| **Ballard:** | I'm on Benning Road and C street (8:18). |
| **Ballard:** | Hello? (9:40.) |
| **Operator:** | Yes sir, I'm still on the line with you (9:41). |
| **Unknown:** | [*background voices can be heard, indecipherable*] (9:45). |
| **Operator:** | Who is that, sir? (9:47.) |
| **Ballard:** | Someone walking past, in the other direction (9:50). |
| **Operator:** | All right (9:53). |
| **Operator:** | And you're still on Benning Road? (10:17.) |
| **Ballard:** | Yes ma'am, Benning Road and B Street. And he's walking along the other side of this street. (10:19.) |
| **Operator:** | All right, I did let the dispatcher know that the individual is still following you (11:15). |
| **Ballard:** | [*shouting, not speaking into receiver*] That's why he's gonna do 15 years! That's why! And you threaten me again, and I should have your ass locked up for assaulting me! Say another word. (11:59.) |
| **Operator:** | Sir, don't say anything to the individual, wait for the officer, okay? (12:16.) |
| **Ballard:** | He's coming over here, ma'am. [*shouting, speaking into receiver*] He's charging me, ma'am! He's charging me! (12:39.) |
| **Operator:** | Are they sti – (12:49). |
| **Ballard:** | [*shouting, not speaking into receiver*] That's why he's gonna do 15 years! The police is on the line, what you gonna do? Bring it on! (12:52.) |
| **Operator:** | Okay sir, where are you now, what 100 block of Benning are you on? (13:13.) |
| **Ballard:** | Benning Road and East Capitol (13:17). |

| | |
|---|---|
| **Operator:** | Benning Road near East Capitol? (13:19.) |
| **Ballard:** | You go—you go—yeah (13:23.) |
| **Operator:** | You're on Benning Road and East Capital? (13:24.) |
| **Ballard:** | [*shouting*] Fuck [*indecipherable*]! That's why your brother gonna do 15 years! Stay off the streets so you can support him! (13:24.) |
| **Operator:** | [*siren is heard in background*] Okay is that the officer? Do you hear them? Or... is it something else... You're going to have to flag 'em down if you see them, sir. (14:09.) |
| **Ballard:** | No, that's the ambulance (14:17). |
| **Operator:** | Oh, okay (14:19). |
| **Ballard:** | Well, I'm almost, I'm almost at, I'm almost at the district (14:30). |
| **Operator:** | I'm sorry? (14:34.) |
| **Ballard:** | I'm almost at Sixth District (14:35). |
| **Operator:** | You're at Fifth District? (14:37.) |
| **Ballard:** | I'm almost at Sixth District (14:40). |
| **Operator:** | Oh, Sixth District, on Benning Road, correct. Well, I'm going to stay on the line with you until the officer arrives at your location, or you reach the– the Sixth District. (14:42). |
| **Operator:** | Is the gentleman still following you sir? (15:39.) |
| **Ballard:** | Naw, he's just standing there looking at me now (15:42). |
| **Operator:** | Okay, so where exactly are you now? (15:47.) |
| **Ballard:** | I'm at the Exxon (15:52). |
| **Operator:** | Okay, on Benning Road, by the Denny's? Okay. Are you still walking? (15:53.) |
| **Ballard:** | No ma'am (16:04). |
| **Operator:** | Yes or no? (16:06.) |

**Ballard:** I'm looking— I'm looking at him. And he just now charged me. Like he was going to do something. To me. (16:07.)

**Operator:** Are you on the property of Exxon? (16:20.).

**Ballard:** I'm on the . . . I'm standing across the street from the Denny's. I'm standing at the Denny's. (16:25.)

**Operator:** So you're near the Denny's. You're closer to Denny's, correct? (16:29).

**Ballard:** Yes ma'am. Here comes the officers. [*shouting, not speaking into receiver*] Here you go, here you go, hey! [*speaking into receiver*] There go the officers. (16:38.)

**Operator:** Okay. Does he see you? (16:44.)

**Ballard:** Yeah (16:47).

**Operator:** He does? Yes or no. (16:48.)

**Ballard:** Yes (16:50).

**Operator:** Okay (16:52).

**Ballard:** [*shouting, not speaking into receiver*] This man right here just now threatened me! (16:55.)

**Operator:** Terminate call, MPD on scene. . . Okay thank you (16:56).