# District of Columbia
# Court of Appeals

No. 13-CF-1499

MATTHEW GABRAMADHIN,



Appellant,

v.

**CF1-5804-13**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: EASTERLY and McLEESE, *Associate Judges*; and REID, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's convictions are vacated, and the matter is remanded for further proceedings.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: April 28, 2016.

Opinion by Associate Judge Roy W. McLeese.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1499

MATTHEW GABRAMADHIN, APPELLANT,

FILED 4/28/16
District of Columbia
Court of Appeals

*Julio Castillo*
Clerk of Court

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-5804-13)

(Hon. Russell F. Canan, Trial Judge)

(Argued October 9, 2015                         Decided April 28, 2016)

*James Whitehead*, Public Defender Service, with whom *James Klein*, *Samia Fam*, *Alice Wang*, and *Chris Kemmitt*, Public Defender Service, were on the briefs, for appellant.

*Danny Lam Nguyen*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Sharon Donovan*, and *Seth M. Gilmore*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

MCLEESE, *Associate Judge*: Appellant Matthew Gabramadhin challenges

his convictions for kidnapping and assault with intent to commit first-degree sexual

abuse. Mr. Gabramadhin argues that the trial court committed reversible error by

admitting into evidence a recorded emergency phone call under the excited-utterance exception to the rule against hearsay. We agree and therefore vacate Mr. Gabramadhin's convictions.

## I.

The evidence at trial was as follows. The complainant, M.H., was a student at Georgetown University. She left a party sometime between midnight and 2:00 a.m. on April 8, 2013. M.H. was intoxicated, having consumed at least six drinks. As she was walking toward Georgetown, she passed through Dupont Circle. Mr. Gabramadhin approached her and said that he was upset because he had broken parole and would have to go back to prison. M.H. sympathized briefly and kept walking. As she was crossing a bridge on P Street, Mr. Gabramadhin walked behind her and talked to her again. Mr. Gabramadhin then grabbed M.H. from behind, said that he had a gun, forced her into a nearby park, and took her purse and cell phone from her. M.H. believed that she lost her shoes in the struggle.

The two sat down in the park, and during the ensuing conversation Mr. Gabramadhin repeated that he was upset about returning to prison. Mr.

Gabramadhin also indicated that he wanted to have sex with M.H. Eventually, Mr. Gabramadhin got on top of M.H. and pinned her to the ground. M.H. screamed and thrashed around, but Mr. Gabramadhin shoved a knit object into her mouth and repeatedly offered to pay M.H. to have sex with him. He warned her not to make him use his gun. Mr. Gabramadhin also put a chalky, bitter powder into M.H.'s mouth, which she spat out. Mr. Gabramadhin eventually told M.H. he would get off her if she would be quiet. She complied, and Mr. Gabramadhin got off her. M.H. pleaded to Mr. Gabramadhin to let her go, but he refused. After further discussion of his parole status, Mr. Gabramadhin again pinned M.H. down, saying that he wanted to have sex with her. M.H. screamed and resisted. After again threatening to use a gun, Mr. Gabramadhin agreed to let M.H. go if she would not tell anyone about what had happened. M.H. agreed, and Mr. Gabramadhin let her go.

As she left the park shortly before 4:00 a.m., M.H. called the Georgetown University Public Safety Department. A Georgetown officer spoke with her for several minutes and then transferred her call to a 911 operator, with whom she spoke for several additional minutes. The trial court admitted a recording of the call into evidence in its entirety as an excited utterance. On the call, M.H. first stated that she had just been assaulted. After providing information about her

location, M.H. explained, "He lifted me into the . . . into the park" and "put some drugs . . . I don't know what it was into my mouth . . . ." M.H. continued updating the officer on her location and expressed concern about standing in one place to wait for the police. When the Georgetown officer transferred the call to a 911 dispatcher, M.H. again reported that she had just been assaulted. M.H. then answered numerous questions, providing her phone number, location, name, and age, repeating answers slowly and clearly when prompted. Responding to other questions, M.H. told the 911 dispatcher that her assailant "put something in [her] mouth," "told [her] he had a gun," and "pinned [her] down," but that he "did not . . . make [her] do anything sexual. He just wanted to talk to [her]." M.H. also described her assailant in response to questions, describing him as "Hispanic or Black" with short hair or a shaved head, wearing jeans and a tee shirt and carrying a backpack. The call ended when the police arrived at M.H.'s location. In total, the call lasted roughly twelve minutes.

The police observed that M.H. was crying and had leaves and dirt on her back and leaves in her hair. M.H. appeared to be intoxicated. M.H. described herself at trial as having been "very confused" and "really afraid" when she spoke with the police that morning, and she further testified that she "could have been in shock."

After obtaining a description from M.H., officers located Mr. Gabramadhin while canvassing the area. Mr. Gabramadhin became nervous when officers informed him that he matched the description of an assault suspect. When an officer unsnapped his holster, Mr. Gabramadhin ran, jumped about ten feet down into a canal, and hid under a bridge. The police apprehended Mr. Gabramadhin, and M.H. identified him as her assailant. When the police questioned Mr. Gabramadhin about the incident, he falsely claimed that he did not remember what had happened.

M.H. brought the police to the park, where officers recovered items including a sock and a Metro fare card with part of M.H.'s name written on it. Officers also recovered M.H.'s shoes, which were in two different locations outside an apartment building across the street from the park.

Mr. Gabramadhin testified in his defense that his encounter with M.H. was consensual. The two struck up a conversation when M.H. walked past Mr. Gabramadhin. M.H. suggested that they walk into the park, where they talked and eventually began kissing. At one point, M.H. removed her jacket and Mr. Gabramadhin "playfully" bit her on the back.

According to Mr. Gabramadhin, M.H. eventually performed oral sex on him, after which he cleaned himself off with a sock. When M.H. started to give Mr. Gabramadhin her contact information, he told her that he had a girlfriend and did not want her contact information. After Mr. Gabramadhin started walking away, M.H. became very angry, followed Mr. Gabramadhin, and cursed at him, yelling loudly that she hated him.

Mr. Gabramadhin testified that he ran from the police because an officer pulled out a gun and because he was on probation and had marijuana on his person. He also explained that he initially lied to detectives about not remembering the incident because he did not think that they would believe his truthful account.

Mr. Gabramadhin's version of events also included reference to calls he made from the park to an escort service. Mr. Gabramadhin testified that he made the calls after biting M.H., because he thought M.H. was angry with him and no longer wanted to interact with him. According to Mr. Gabramadhin, M.H. told him to hang up the phone and the two kissed again. M.H. did not refer to these calls in her testimony. The United States's theory was instead that Mr. Gabramadhin made the calls before encountering M.H., while trying to find someone to have sex with him. The United States also implied that M.H. matched

some of the stated physical attributes -- including "blonde" and "college girl" -- of the escorts Mr. Gabramadhin had tried to contact.

Ms. Paige DePetro, who lived in an apartment building near the park, testified that she awoke from her sleep shortly before 3:00 a.m. to "blood curdling" screams. Although she was not sure of the exact words used, Ms. DePetro then heard the same woman's voice scream something like, "Fuck you. I hate you," and "I'll hate you for the rest of my life." Ms. DePetro did not hear anyone scream for help.

Two of M.H.'s friends also testified. M.H.'s roommate testified that M.H. told her about the incident the morning it occurred and that M.H. was very upset at the time and thereafter. The other witness, a former co-worker, testified that when she exchanged text messages with M.H. a few hours after the incident, M.H. did not mention an assault and instead joked about the party they had attended. When M.H. told her friend about the assault several days later, M.H.'s demeanor was "straightforward" and not emotional, which her friend testified was characteristic of M.H.

Additional evidence at trial included photographs taken of M.H. on the

morning of the incident depicting dirt and various scratches, scrapes, and bruises. Defense counsel suggested that one photograph depicted a bite mark, which was inconsistent with M.H.'s account that she wore a leather jacket the entire night and that Mr. Gabramadhin pinned her down on her back. The United States argued that there was no evidence that the photo showed a bite mark and that the injury in the photo instead was consistent with being pinned to the ground.

The United States also introduced evidence regarding tests performed on the sock recovered from the park. Those tests indicated the presence of an enzyme typically found in saliva but also found in trace amounts in semen. Further tests showed that M.H. was the major contributor of DNA found on the sock and that Mr. Gabramadhin could not be excluded as a possible contributor. The United States argued that the tests were consistent with M.H.'s testimony that Mr. Gabramadhin shoved a sock into her mouth when he pinned her to the ground.

M.H. and Mr. Gabramadhin were each impeached in various respects, and opposing counsel contended during closing arguments that M.H. and Mr. Gabramadhin had each molded his or her story to conform to the evidence. Defense counsel questioned where M.H. lost her shoes, whether she voluntarily walked into the park or was forcibly dragged, and whether she had originally

described the object shoved into her mouth as a red hat rather than a black sock. Defense counsel also raised questions about M.H.'s inability to explain the Metro fare card with her name on it, the words that Ms. DePetro heard, and the injury that looked like a bite mark. In addition to intimating that Mr. Gabramadhin's presence throughout trial allowed him to adapt his testimony to that of other witnesses and to the physical evidence, the prosecutor questioned Mr. Gabramadhin's motives in running from the police and lying to them when he was first apprehended.

## II.

## A.

The United States filed a pretrial motion to admit a recording of the emergency call under the present-sense-impression and excited-utterance exceptions to the rule against hearsay. The United States argued that the call was admissible in its entirety as an excited utterance. The United States also identified several specific parts of the call that it argued were admissible as present sense impressions, such as M.H.'s description of her location and the clothing she was wearing. Finally, the United States argued in a footnote that M.H.'s descriptions of her assailant were admissible as statements of prior identification, but the United

States did not identify what parts of the call were admissible under that exception.

The trial court reserved its ruling on the motion pending M.H.'s testimony. After M.H. testified, the trial court granted the motion without initially stating its reasons. In later explaining its ruling, the trial court ruled that the call was admissible in its entirety as an excited utterance. The trial court also ruled that part of the call was admissible as a present sense impression and that "large parts" of the call were admissible as statements of prior identification. The trial court did not specify what parts of the call were admissible under the latter hearsay exceptions.

In admitting the emergency call in its entirety, the trial court concluded that attempted sexual assault constituted a "serious occurrence" that would cause nervous excitement or shock; that M.H. made the emergency call "within a very reasonably short period of time after the occurrence"; and that the recording of the call established that M.H. was in a "very nervous, distraught state of mind."

The trial prosecutor played a recording of the call in its entirety during M.H.'s testimony and also played the recording to begin closing argument. The trial prosecutor also commented on the call several times during closing argument

and rebuttal, and played at least a part of the call at a later point in the closing argument as well. The jury found Mr. Gabramadhin guilty as charged.

**B.**

For a statement to be admissible as an excited utterance, the statement's proponent must show:

> (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances [that] in their totality suggest spontaneity and sincerity of the remark.

*Mayhand v. United States*, 127 A.3d 1198, 1205 (D.C. 2015) (internal quotation marks omitted). We review a trial court's factual determinations for clear error and review for abuse of discretion the trial court's determination whether the facts support admission as an excited utterance. *Id.*

We conclude that admission of the call in its entirety was an abuse of discretion. In reaching that conclusion, we rely on a combination of circumstances

that in our view forecloses a determination that M.H.'s statements on the call were a "spontaneous reaction to the exciting event" rather than "the result of reflective thought." *Mayhand*, 127 A.3d at 1205 (internal quotation marks omitted).

First, the call lasted for roughly twelve minutes. Our cases indicate that lengthier statements are less likely to reflect spontaneity and lack of reflection. *See Mayhand*, 127 A.3d at 1201, 1211 (statements made during call lasting seventeen minutes were not spontaneous); *Lyons v. United States*, 622 A.2d 34, 47 ("lengthy statement to the police" suggested lack of spontaneity), *reh'g en banc granted and op. vacated*, 635 A.2d 902 (D.C. 1993) (per curiam).[1]

Second, M.H. gave detailed and patient responses to many questions from both the Georgetown officer and the 911 dispatcher. We recognize that statements made in response to questions from law enforcement are not automatically inadmissible as excited utterances. *See, e.g.*, *Lewis v. United States*, 938 A.2d 771, 776 (D.C. 2007). Nevertheless, M.H.'s rational, patient answers, and her repetition

---

[1] *Lyons*'s precedential value is somewhat uncertain. *Compare Coates v. United States*, 705 A.2d 1100, 1104 (D.C. 1998) ("*Lyons* has been vacated and thus has no force of law."), *with Reyes v. United States*, 933 A.2d 785, 792 n.8 (D.C. 2007) (relying on *Lyons* because "this court has not repudiated the analysis undertaken in that case in any subsequent opinion"). In any event, we find *Lyons* persuasive on the points for which we cite it in this decision.

of those answers during the call, suggest reflection rather than spontaneity. *See, e.g.*, *Mayhand*, 127 A.3d at 1207-11; *Odemns v. United States*, 901 A.2d 770, 779 (D.C. 2006) (statements were not admissible as excited utterances, where although robbery victim who spoke to police an hour after incident was "upset," "excited," "shaken," and "afraid," victim generally gave "evidently responsive and rational answers").

Third, M.H. initiated the call. As in *Mayhand*, "[t]his was not a situation where the police, summoned by a third party, arrived at the scene and encountered an individual wholly undone by a traumatic incident." 127 A.3d at 1211.

Fourth, we have had the opportunity to listen to the recording of the call. *Cf. United States v. Woodfolk*, 656 A.2d 1145, 1151 n.16 (D.C. 1995) ("The trial court was entitled to consider the declarant's tone and tenor of voice on the tape recording in determining the issue of excited utterance."). We recognize that the trial court concluded that M.H. was in a "very nervous, distraught state of mind." Even granting deference to the trial court's conclusion, we conclude that the tone and contents of the call are consistent with a determination that M.H. was upset, but they are not consistent with a determination that M.H. was so upset that she was unable to reflect or was speaking reflexively. *See Mayhand*, 127 A.3d at 1206

(accepting trial court's description of declarant's tone on 911 call as "emotionally agitated" but concluding, based on review of call on appeal, that declarant's tone did not reflect level of emotional upset necessary to support admission of call as excited utterance).

None of these circumstances on its own is necessarily dispositive. Collectively, however, they undermine a conclusion that M.H.'s statements were sufficiently spontaneous to be admissible as excited utterances. We view the circumstances of this case as comparable to those of our recent decision in *Mayhand*, which was decided after the trial court's ruling in the present case. In *Mayhand*, we held that the trial court should have excluded a 911 call in which the declarant reported the defendant's verbal threats. 127 A.3d at 1201. We concluded that the 911 call demonstrated a degree of self-awareness that did not suggest that the statements were spontaneous and non-reflective. *Id.* at 1211. We observed that the declarant had initiated the call to the police, "not merely to ask for help, but to document [the defendant's] criminal behavior," and that the declarant "reasonably" responded to many questions over the course of seventeen minutes, repeating answers when necessary. *Id.* We further explained that a declarant's ability to "produce deliberative and thoughtful answers" undermined the necessary elements of spontaneity and non-reflection. *Id.* at 1210.

At oral argument, the United States identified *Lewis v. United States*, 938 A.2d 771 (D.C. 2007), as most comparable to the present case. We view *Lewis* as quite different from the present case. First, the declarant in *Lewis* had a large amount of blood on her shirt, was "bleeding from the head and face area as the result of multiple lacerations," and required emergency medical assistance. *Id.* at 773-74 (internal quotation marks omitted). M.H. did not need medical treatment and her injuries were limited to bruising and scratches. Second, the declarant in *Lewis* was approached by the police, *id.* at 781 n.8, whereas M.H. initiated the call to the police. Third, there is no suggestion in *Lewis* that the declarant's statement was remotely comparable in length and detail to the call in the present case. *Id.* at 773-76. Fourth, there are indications in *Lewis* that the declarant was so upset she was not able to respond to questions at times, *id.* at 774, whereas M.H. was capable of answering every question asked (and at times painstakingly repeating those answers) throughout the call. Finally, the statements at issue in *Lewis* were not recorded, whereas in the present case we have been able to listen to the call and therefore have additional information about M.H.'s tone and the contents of the call. In sum, we conclude that the circumstances of this case are much more similar to those of *Mayhand* than to those of *Lewis*.

The other cases relied upon by the United States are equally distinguishable.

*See, e.g.*, *Goodwine v. United States*, 990 A.2d 965, 966-67 (D.C. 2010) (911 call made by victim during assault and statements made to police by victim within two to three minutes after call admissible as excited utterances, where victim was "upset and agitated," had been struck in head, and was treated at hospital; no indication victim's statements were detailed and lengthy); *Reyes v. United States*, 933 A.2d 785, 789-91, 790 n.7 (D.C. 2007) (victim's statement to police admissible as excited utterance, where victim was "rambling off several things at once in a very agitated tone of voice" after "sustaining a significant injury causing profuse and prolonged bleeding and significant pain"; no indication statement was detailed and lengthy); *Teasley v. United States*, 899 A.2d 124, 126-29 (D.C. 2006) (upholding admission of uninjured carjacking victim's 911 call and subsequent call to family, because trial court heard 911 call and determined that victim mumbled to himself, had trouble recalling his own car's license plate number, and also uncharacteristically used profanity in call with family; no indication statements were detailed and lengthy); *Welch v. United States*, 689 A.2d 1, 2-4, 3 n.5 (D.C. 1996) (per curiam) (rape victim's statements to police admissible as excited utterances, where victim was crying uncontrollably, was shaking, and had swollen face, and statements were "disjointed" and victim "narrated without appearing to have to think of what to say").

**C.**

For the foregoing reasons, we conclude that it was error to admit the call at issue in its entirety as an excited utterance. A nonconstitutional error is harmless if we can "say[] with fair assurance" that the error did not substantially sway the judgment. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). This inquiry turns not on whether the other evidence presented at trial would be sufficient to establish guilt, but rather on whether it is "highly probable" that the error at issue did not contribute to the verdict. *In re Ty.B.*, 878 A.2d 1255, 1266-67 (D.C. 2005) (internal quotation marks and emphasis omitted). The United States bears the burden of establishing harmlessness. *Lucas v. United States*, 102 A.3d 270, 279 (D.C. 2014).

It appears to be undisputed that M.H. testified at trial to all material facts stated in the call. Thus, the call was in essence an erroneously admitted prior consistent statement. Erroneous admission of prior consistent statements can have the prejudicial effect of unfairly bolstering the witness's credibility. *Daye v. United States*, 733 A.2d 321, 327 (D.C. 1999). We have observed, however, that the erroneous admission of prior consistent statements may be "less serious than the inadmissible introduction of clearly prejudicial evidence." *Id.* (internal

quotation marks omitted). Thus, we have said, only where "the government's proof of guilt was 'marginal' have we thought the prejudice from this impermissible bolstering enough to warrant reversal without more." *Id.*

Although we do not view the United States's proof of guilt in this case as marginal, this was a closely contested case that turned almost entirely on the respective credibility of M.H. and Mr. Gabramadhin. Moreover, there are a number of reasons for concern that the erroneous admission of the call in this case might have affected the jury's verdict.

First, the contents of the call went directly to whether or not the encounter between Mr. Gabramadhin and M.H. was consensual, which was the central issue at trial. Bolstering M.H.'s credibility on that central issue could well have affected the jury's verdict. *See Lyons*, 622 A.2d at 49 (error in admitting prior consistent statement as excited utterance was not harmless, where witness credibility was central to jury's decision).

Second, the physical evidence and other testimony in this case did not clearly favor one account over the other. Much of the physical evidence, such as the presence of M.H.'s DNA on the sock, was consistent with both accounts. Each

side relied on certain aspects of the physical evidence, such as the signed Metro card and injury on M.H.'s back (which the defense argued M.H. could not adequately explain) and the cuts on M.H. and where the police found her shoes (which the United States argued the defense could not adequately explain), but those points were not dispositive. The testimony about M.H.'s statements to friends after the incident pointed in both directions, as did the testimony from Ms. DePetro about what she overheard. Both M.H. and Mr. Gabramadhin were impeached in a variety of other respects as well. Although evidence of Mr. Gabramadhin's flight and false statement to the police was probative, Mr. Gabramadhin provided an explanation for that evidence that the jury might have accepted. *Cf. generally, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[F]light is not necessarily indicative of ongoing criminal activity.").

Third, the statements in the call might well have been more persuasive to the jury because of their temporal proximity to the incident and the level of detail they contained. *Cf. Carey v. United States*, 647 A.2d 56, 58 (D.C. 1994) (hearsay exception for past recollection recorded reflects idea that details will be clearer in witness's mind soon after event rather than later at trial).

Fourth, the trial prosecutor relied heavily on the call, playing it in full during

M.H.'s testimony, playing at least a portion of it again at the very beginning of closing argument, playing another part of it during closing argument, and referring to the call at a number of points during closing argument.  We have emphasized that a "prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial." *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004) (internal quotation marks and brackets omitted); *see also, e.g.*, *Lyons*, 622 A.2d at 48 (prosecutor's use of erroneously admitted prior consistent statement during closing argument to bolster credibility and corroborate testimony contributed to conclusion that error was not harmless).

For these reasons, we cannot say with substantial assurance that the call did not influence the verdict.  *Cf. Warren v. United States*, 436 A.2d 821, 842-43 (D.C. 1981) (reversing in part based on erroneous admission of prior consistent statements; "The repetitious narrations of the complainants' reports and their pretrial testimony artificially strengthened the complainants' identifications . . . .").

We are not persuaded by the United States's arguments to the contrary.  We view the cases relied upon by the United States as distinguishable, primarily because the cited cases involved far more substantial corroborative evidence than

existed in the present case. *See Reyes*, 933 A.2d at 793 n.10 (even if statement was erroneously admitted as excited utterance, any error was harmless given testimony of two other witnesses and fact that defendant was indisputably linked to assault because victim's blood was in defendant's car and victim's wedding ring was found where defendant was apprehended); *Ventura v. United States*, 927 A.2d 1090, 1102-04 (D.C. 2007) (erroneous admission of prior consistent statements by victim harmless, where defense counsel at least partially invited error, defense counsel admitted some prior consistent statements by victim for strategic reasons, victim's testimony was corroborated by other evidence, and defense case was weak); *Daye*, 733 A.2d at 328-29 (erroneous admission of victim's prior consistent statements harmless, given strength of government's evidence, including that two eyewitnesses testified "with essential uniformity" about events and that defendant confessed to close friend).

We recognize that the trial court ruled that part of the call was admissible as a present sense impression and that "large parts" of the call were admissible as statements of prior identification. For several reasons, however, we are not in a position to affirm on that basis.

First, the trial court did not specify what portions of the call were admissible

under these exceptions. Second, although the United States did identify certain innocuous statements that would come in as present sense impressions (such as where M.H. was when she made the emergency call), neither in the trial court nor in its brief on appeal did the United States otherwise clearly indicate what portions of the call would be admissible under those exceptions. Third, the United States mentioned these alternative hearsay exceptions only in a footnote in its brief on appeal, and did not provide specific legal or factual argument on the issue. As we have explained, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Graham v. United States*, 12 A.3d 1159, 1165 n.9 (D.C. 2011) (internal quotation marks omitted) (declining to address question whether statement lacked foundation to be admissible as prior statement of identification, where appellant challenged admissibility on other grounds).

As the United States acknowledged at oral argument, the proponent of evidence bears the burden of establishing which statements are admissible under which hearsay exceptions. *See Patton v. United States*, 633 A.2d 800, 806 (D.C. 1993) (per curiam) ("[T]he government and the trial court—not the defendant/appellant—had the burden, upon objection, of justifying admissibility under a specified exception to the hearsay rule . . . ."). In the absence of specific

findings from the trial court and adequate briefing from the United States, we are unable to rely on these alternative hearsay exceptions as bases upon which to conclude that the erroneous admission of the call as an excited utterance was harmless.

For the foregoing reasons, we vacate Mr. Gabramadhin's convictions and remand the case for further proceedings.

*So ordered.*