*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-601

KYWONE D. PELZER, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED  **08/17/2017**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF2-20908-13)

(Hon. Zoe Bush, Trial Judge)

(Submitted June 24, 2016                                     Decided August 17, 2017)

Before BLACKBURNE-RIGSBY, *Chief Judge*,[*] EASTERLY, *Associate Judge*, and REID, *Senior Judge*.

EASTERLY, *Associate Judge*:  Kywone D. Pelzer appeals his conviction after a jury trial for robbery.[1]  He argues that his conviction should be reversed because the evidence was legally insufficient, and because the trial court made a number of evidentiary and instructional errors.  We conclude that the evidence was sufficient

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge of the court at the time this case was submitted.  Her status changed to Chief Judge on March 18, 2017.

[1] D.C. Code § 22-2801 (2013 Repl.).

to permit a reasonable juror to find Mr. Pelzer guilty of robbery, and we reject all but one of Mr. Pelzer's other arguments—that the trial court abused its discretion when it admitted the recording of the complainant's 911 call into evidence under the hearsay exception for excited utterances. But because the admission of this recording was harmless in light of the other evidence presented, including the complainant's in court testimony, we affirm.

## I.   The Evidence at Trial

Preston Mitchum testified at trial that Mr. Pelzer had robbed him and gave the following account of the incident:  as Mr. Mitchum was riding the bus home on a late fall evening, listening to music on his new iPhone, he noticed that a man he did not know (later identified as Mr. Pelzer) was taking special interest in him. Mr. Pelzer, who was sitting some distance away from Mr. Mitchum toward the front of the bus, kept looking over his shoulder to stare at Mr. Mitchum, who was sitting toward the rear of the bus. Mr. Pelzer then moved seats to sit in a forward facing seat immediately adjacent to Mr. Mitchum's side-facing seat. When the bus reached the first of two stops where Mr. Mitchum could have exited, Mr. Mitchum stood up to exit, but when Mr. Pelzer also stood, Mr. Mitchum, now "uncomfortable with what was happening," sat back down. At the second stop,

Mr. Mitchum again stood up (as did Mr. Pelzer), then sat back down again, and then, just as the bus was about to pull away, asked the driver to open the back door and exited the bus. Mr. Pelzer walked off the bus behind Mr. Mitchum.

Now on the street, Mr. Pelzer approached Mr. Mitchum, who was still holding his phone in his hand, and asked, "what kind of phone is that?" After Mr. Mitchum told him it was an iPhone 5C, Mr. Pelzer "aggressive[ly]" asked, "let me use your phone." Mr. Mitchum initially responded that he did not think that was a good idea. He then noticed Mr. Pelzer making "a hand motion near like the chest area" "inside [his] jacket." Concerned Mr. Pelzer might have a weapon, Mr. Mitchum thought to himself, "it is not worth it, it is just a phone, I can just use my insurance to get another one, it really is not that big of a deal." He began to enter his pass code to unlock the phone for Mr. Pelzer, but before he finished, Mr. Pelzer grabbed the phone and ran across the street. Mr. Mitchum yelled after him, "sir, you have my phone," but Mr. Pelzer kept running.

Mr. Mitchum, still thinking it was possible that Mr. Pelzer was armed, did not follow him. Mr. Pelzer ran by a high school student whom Mr. Mitchum knew and who had walked off the bus ahead of Mr. Mitchum and Mr. Pelzer; the student looked at Mr. Mitchum "to make sure I was okay," and Mr. Mitchum "kind of just

waved him on and told him to just go home." Mr. Mitchum waited until Mr. Pelzer was out of sight and then headed home, walking in the same direction Mr. Pelzer had run.

On his way home, Mr. Mitchum happened upon a police car, reported the theft of this phone to the two officers in the car, Officers Newberry and Robinson, and gave a detailed description of the perpetrator. Mr. Mitchum "made the formal report to 911 when [he] got [home] by using [his] . . . roommate's cell phone," after realizing that he had not given the police his contact information. The government successfully moved for its admission as an excited utterance and played a recording of this call for the jury.

Officer Newberry also testified at trial and stated that he and his partner had canvassed the area using the description given by Mr. Mitchum and stopped Mr. Pelzer later that evening. In a show-up procedure, Mr. Mitchum positively identified Mr. Pelzer as the man who had taken his phone. When the police searched Mr. Pelzer, they recovered Mr. Mitchum's iPhone.

Testifying in his own defense, Mr. Pelzer acknowledged that he had had Mr. Mitchum's iPhone but gave a different account of how it came into his possession.

Mr. Pelzer explained that, after he exited the bus with Mr. Mitchum,[2] he needed to make a call quickly,[3] but he could not use his own cell phone because, although he had recently purchased one, he had not yet activated it. Mr. Pelzer asked Mr. Mitchum if he could borrow the iPhone, and Mr. Mitchum gave it to him. Mr. Pelzer then walked ahead of Mr. Mitchum because he "didn't want to be seen with [Mr. Mitchum]."[4] They walked together in this manner, across the intersection and down the street. But at some point, Mr. Mitchum ran away. Mr. Pelzer called after him, but Mr. Mitchum did not return. Mr. Pelzer remained in the area in hopes of reconnecting with Mr. Mitchum. Ultimately, he walked by a police officer on the street and was stopped and arrested; thereafter he gave a statement to the police, clips of which were played during cross examination.[5]

---

[2] Mr. Pelzer denied following Mr. Mitchum off the bus. He also denied moving seats to sit closer to Mr. Mitchum on the bus, testifying that the seat next to Mr. Mitchum had been the only one he could find.

[3] Mr. Pelzer inconsistently testified that he was waiting for a friend to get off work at a barbershop in view of the bus stop, but he felt "pressed for time" because he was barred from the area, and he just wanted to "use the phone, grab my friend and leave"; and that he was permitted to be at the bus stop but that he was barred from the area of the barbershop and he had just gone to the store for his friend, so he just wanted to call his friend, "give [him] what I had for him" and then leave the area.

[4] Mr. Pelzer indicated that he had a discriminatory reason for wanting to keep his distance and testified that did not "want to be seen with the guy that didn't seem normal to me, like my type of friend."

[5] This court was not provided with a copy of the clips of the video-taped statement.

Having heard this evidence, a jury convicted Mr. Pelzer of robbery. This appeal followed.

## II.    Sufficiency of the evidence

Mr. Pelzer argues that that there was insufficient evidence to find that he took Mr. Mitchum's phone against his will, an essential element to the crime of robbery. *See Gray v. United States*, 155 A.3d 377, 382 (D.C. 2017). Reviewing the evidence in the light most favorable to the government, as we must, *see, e.g.*, *Williams v. United States*, 113 A.3d 554, 560 (D.C. 2015), we conclude that a reasonable juror could have concluded that Mr. Mitchum did not voluntarily cede possession of his new iPhone to Mr. Pelzer based on Mr. Mitchum's testimony that Mr. Pelzer staked him out on a Metrobus, followed him off the bus onto the street, aggressively asked to use his phone, and then grabbed it from his hands and jogged away with it, while Mr. Mitchum called after him, "sir, you have my phone."

## III.    Excited Utterance Analysis

Turning to the trial court's admission of Mr. Mitchum's call to 911 as an excited utterance, we first review the law that the trial court and our court must

apply. As we recently explained in *Mayhand v. United States*, the test a trial court must apply before "admitting an out-of-court statement offered for the truth of the matter asserted under the 'excited utterance' exception to the rule against hearsay is well established in this jurisdiction and has three parts." 127 A.3d 1198, 1205 (D.C. 2015). The trial court must confirm that the proponent of the hearsay statement has established:

> (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.
>
> In all cases the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event.

*Id*. (citations and internal quotation marks omitted); *accord Gabramadhin v. United States*, 137 A.3d 178, 183 (D.C. 2016).

Regarding this court's review of a trial court ruling that a statement is admissible as an excited utterance, in *Mayhand*, we explained:

> Whether a statement constitutes an excited utterance depends upon the facts peculiar to each case,

and each element of the three-part test must be met before such a statement may be admitted into evidence. The trial court has the legal responsibility to examine the testimony and determine whether the proper foundation has been laid before deciding whether the exception applies. We commit this decision to the trial court's exercise of sound judicial discretion. Accordingly, we review the trial court's fact-finding for clear error, and we review the court's determination that these facts permit admission of a statement under the excited utterance exception for abuse of discretion. Obviously, whether the trial court adheres to the test for the admission of hearsay under this exception is a legal question and the trial court abuses its discretion when it rests its conclusions on incorrect legal standards.

127 A.3d at 1205 (citations and internal quotation marks omitted).

Before trial began in this case, the government moved to admit a recording of the 911 call made by Mr. Mitchum after he returned home. In the call, Mr. Mitchum said that he had just been mugged and already reported the crime to police officers he encountered on the street, but that he realized that he had failed to give them his contact information. In response to questions from the 911 operator, he then gave his full mailing address, a detailed description of the perpetrator,[6] two phone numbers where he could be reached, and location

---

[6] Mr. Mitchum described the perpetrator as "a black male about 5'8" to 5'10" [with] gold teeth [and a] camouflage jacket on with a hoodie pulled over his head. It was like an army camouflage jacket with blue jeans."

information for the incident. The court listened to the recording of Mr. Mitchum's call and then, without having heard any other evidence in the case, evaluated its admissibility as an excited utterance.

The trial court found that, "[w]e do have a startling event. And under the case law, it is within a reasonable proximity with respect to time. [And t]he statement does relate back to the startling event and the witness appears by his voice to still be under the effects of the startling event." Based on these findings, the trial court determined that the government had carried its burden to establish that Mr. Mitchum's 911 call was admissible as an excited utterance.[7]

We conclude that the court both failed to consider one of our three established criteria for the admission of hearsay statements under the excited utterance exception, *see supra*, and improperly concluded that the two criteria it did consider were satisfied.

First, the trial court was obligated to confirm "the presence of a serious

---

[7] *See Gabramadhin*, 137 A3d at 187 ("[T]he proponent of the evidence bears the burden of establishing which statements are admissible under which hearsay exceptions."); *accord Best v. United States*, 66 A.3d 1013, 1017 (D.C. 2013).

occurrence which [could both] cause[] a state of nervous excitement or physical shock in the declarant," *Mayhand*, 127 A.3d at 1205, and suspend his powers of reflection, *id.* at 1206–07 (explaining that the "essential rationale of this hearsay exception is that statements made while a person is overcome by excitement or in shock are fundamentally trustworthy," and that "because our aim is to ensure that an individual's powers of reflection have been suspended, we require a much higher level of emotional upset [than an indication of some distress] to support the admissibility of a hearsay statement as an excited utterance"). Assuming the theft of a phone could constitute such an incident,[8] the trial court was initially obligated to consider Mr. Mitchum's state of mind immediately after the incident to ascertain its actual effect on Mr. Mitchum. But although the court pronounced that there was "a startling event," in fact it had been given no evidence about Mr. Mitchum's state of mind immediately after the incident. Instead, the court appeared to look to Mr. Mitchum's state of mind from his later phone call to infer the immediate effect

---

[8] As it turned out, evidence at trial corroborated that there had been a theft: Mr. Mitchum's phone was recovered from Mr. Pelzer, a stranger to Mr. Mitchum. The trial court did not know about this evidence at the time it ruled, however, and instead appeared to believe that Mr. Mitchum's account of the theft in the proffered statement was self-validating as to the occurrence of a stress-inducing event. *But see Mayhand*, 127 A.3d at 1206 n.9 (noting that the trial court "did not consider whether the uncorroborated out-of-court statement proffered as an excited utterance could serve as the sole proof that an exciting event had occurred" and citing cases indicating that the excited utterance exception applies "only when there has been independent evidence of an exciting event").

of the incident on his state of mind.[9]  But this collapses the first step of the excited utterance inquiry—namely, whether there was a shocking event—into the second step of the excited utterance analysis—whether, at the time the declarant spoke, he was still under the influence of the shocking event.[10]

In the second step of its analysis, the court was obligated to confirm that the shocking impact of the incident was sufficiently lasting such that the declarant's

---

[9] Had the trial court deferred ruling on the admissibility of the 911 call until it heard testimony from Mr. Mitchum, it clearly would not have had the requisite evidence to conclude that a startling event had occurred.  Mr. Mitchum gave no indication that his powers of reflection were suspended.  Instead, he testified that he made the rational calculation that it was not worth it to resist and that he could simply "use [his] insurance to get another [phone]."  And after Mr. Pelzer took his phone, he waved reassuringly to a youth he knew from the neighborhood who seemed to be looking across the street to check to see if he was ok.  Three to five minutes later, he saw two officers in a police cruiser, told them what had happened, and gave them an "exact[]" description of the perpetrator.

[10] The government implicitly acknowledges that, to determine if a startling event occurred, the court's attention should have been focused at the outset on Mr. Mitchum's mental state immediately after that event—not at the time he called 911.  For this first step of the admissibility analysis, the government highlights evidence that the trial court had not heard at the time it issued its admissibility ruling:  trial testimony from Officer Newberry regarding Mr. Mitchum's emotional state when he first reported the crime to the police.  As the government summarizes Officer Newberry's testimony, Mr. Mitchum "was so upset that at first he could not even verbalize a description of the robber."  But although Officer Newberry testified that Mr. Mitchum was initially "startled," "frantic," and "shaking," Officer Newberry also testified that he and his partner were able to get Mr. Mitchum to "settle down" and to give them a description of the perpetrator, which they then used to apprehend Mr. Pelzer.

powers of reflection were still suspended at the time the proffered statement was made. *Odemns v. United States*, 901 A.2d 770, 776 (D.C. 2006) (explaining that the statement must be made "within a reasonably short period of time after the [shocking incident] so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it"). As to this factor, all the trial court said was that "under the case law, it is within a reasonable proximity with respect to time," presumably because Mr. Mitchum had told the 911 operator that the incident had occurred approximately fifteen minutes earlier.[11] It appears from this statement that the court did not conduct a fact-based assessment of the duration of Mr. Mitchum's shock but, instead, seemed to think that statements made within "reasonable [temporal] proximity" to an alleged shocking incident fall within a safe harbor of categorical admissibility—a proposition the runs directly contrary to our caselaw. *See Mayhand*, 127 A.3d at 1210 (observing "[t]here is no standard . . . grace period for the admission of excited utterances"); *see also id*. at 1209 ("Although a highly shocking, violent, or serious event can have a more lasting emotional effect, the law generally requires an excited utterance to be more or less

---

[11] Again, it is questionable whether the excited utterance itself may provide the only evidence of the occurrence or timing of the alleged exciting event. *See supra* note 8 and accompanying text; *Mayhand*, 127 A.3d at 1209 (noting that the contemporaneity element was not satisfied where "there [wa]s no evidence in the record about when the alleged [shocking incident] had actually occurred, or how much time had passed before [the declarant] called 911").

contemporaneous with the event that induced the excitement.").[12]

Moreover, having listened to the recording of Mr. Mitchum speaking with the 911 operator ourselves,[13] and, even deferring to the trial court's apparent finding that Mr. Mitchum (who was audibly emotional emotion at times) was upset as reflected "by his voice,"[14] we can find no basis for the trial court to have concluded that his powers of reflection (if they were ever compromised) were still suspended at this time. *See Gabramadhin v. United States*, 137 A.3d 178, 184 (D.C. 2016) (concluding "that the tone and contents of the call are consistent with a determination that [the declarant] was upset, but they are not consistent with a determination that [the declarant] was so upset that she was unable to reflect or was speaking reflexively"). After the 911 operator came on the line, Mr. Mitchum explained the purpose of his call, i.e., that he had reported a mugging to police

---

[12] The government acknowledges that "[t]here is no fixed time requirement for a statement to qualify as an excited utterance" but asserts that this case "falls well within the range this [c]ourt has recognized may support an excited utterance." To be clear, we examine each case based on its facts. There is no standard "range."

[13] Like other divisions, we have taken *"the opportunity to listen to the recording"* of the call admitted as an excited utterance. *See, e.g.*, *Gabramadhin*, 137 A.3d at 183–84; *Mayhand*, 127 A.3d at 1206.

[14] *Gabramadhin*, 137 A.3d at 183–84 (recognizing "that the trial court concluded that [the declarant] was in a very nervous, distraught state of mind," but concluding that her statement was not an excited utterance "even granting deference to the trial court's conclusion").

officers he encountered on the street, but he realized once he got home that he had failed to give them his contact information. The operator then asked for his address, and he gave his full mailing address. When the operator asked him whether the perpetrator had a weapon, requiring him to reflect on the earlier incident, Mr. Mitchum briefly lost his composure[15] and was unable to speak. But when he resumed talking, he was reflective and responsive and carefully answered (inaccurately) that Mr. Pelzer had "said" he had a weapon.[16] In response to the operator's subsequent request for a description of the perpetrator, he gave a detailed picture of "a black male about 5'8" to 5'10" [with] gold teeth [and a] camouflage jacket on with a hoodie pulled over his head. It was like an army camouflage jacket with blue jeans." By the end of the two-minute call he was speaking calmly, offering the 911 operator two possible numbers where he could be reached and giving additional detail about the location of the incident "if it

---

[15] *But see Mayhand*, 127 A.3d at 1208 ("[T]here is a difference between the stress or excitement caused by the original event and that caused by the trauma of having to retell what happened after initially calming down. Only [a statement made in] the former [circumstance] is admissible as an excited utterance." (quoting *In re L.L.*, 974 A.2d 859, 864 (D.C. 2009))); *see also Odemns*, 901 A.2d at 777 (explaining that this "hearsay exception was . . . intended to apply to situations in which the declarant was so excited by the precipitating event that he or she was still under the spell of its effect" (internal quotation marks omitted)).

[16] At trial Mr. Mitchum acknowledged that he had indicated in his 911 call that Mr. Pelzer had made a "statement orally" about having a weapon but "clarif[ied]" that Mr. Pelzer had never said he had a weapon. Mr. Mitchum simply "assumed he did based on his language and [his] reaching into [his] chest area."

helps anymore."

Third, as to whether the circumstances in their totality suggest the spontaneity and sincerity of Mr. Mitchum's statements, the court did not appear to consider this essential element at all. *Mayhand*, 127 A.3d at 1211 (citing *Melendez v. United States*, 26 A.3d 234, 245 (D.C. 2011), for the proposition that "all three elements must be met"). Instead, the court seemed to think that, because Mr. Mitchum reflected emotion in his voice at one point during the 911 call and had spoken to the police "within a reasonable proximity with respect to time," his statement to the police qualified for admission as an excited utterance.

Had the trial court considered this factor, we doubt that it would have weighted it in the government's favor. Mr. Mitchum's statements in his call to 911 were not spontaneous. Rather, they were made after he had already spoken to the police on the street, returned home, and then remembered that he had failed to give the police his contact information. He borrowed a phone to call 911 to provide the police with that missing information—indeed he told the operator at the outset of his call that was his purpose in calling—and thereafter precisely responded to the operator's follow-up questions. *See Gabramadhin*, 137 A.3d at 183 (noting that "statements made in response to questions from law enforcement are not

automatically inadmissible," but they are not excited utterances when circumstances "suggest reflection rather than spontaneity"); *cf. Lewis v. United States*, 938 A.2d 771, 774, 776 (D.C. 2007) (affirming admissibility of answer to police question regarding need for medical attention where declarant was "very, very upset" and repeatedly stated that her husband had tried to kill her). As for the sincerity and reliability of his statements, Mr. Mitchum later admitted at trial that, regarding the critical question of whether Mr. Pelzer said he was armed, he had given the 911 operator inaccurate information.[17]

We conclude that the trial court did not properly consider the elements of the test for an excited utterance and, given this record, that "the trial court could not reasonably have deemed these statements admissible under this exception to the rule against hearsay." *Mayhand*, 127 A.3d at 1211. Nonetheless, we will find a

---

[17] In addition to dismissing Mr. Mitchum's inaccurate statement as related to only a "minor detail," and arguing that there is no indication that Mr. Mitchum "intentionally misle[]d" the 911 operator, the government argues that "it is reasonable to infer that [Mr. Mitchum's] minor lapse in saying that [Mr. Pelzer] said he was armed simply reflected the stress [the complainant] still was experiencing." But the government misses the point that the rationale for this exception to the rule against hearsay is the theory that "the wash of excitement blocks the reflection and calculation that could produce false statements" and provides adequate assurance that the out-of-court statement is reliable. *Mayhand*, 127 A.3d at 1206. In light of this rationale, it would be incongruous to say that emotion that induces unreliability in the proffered statement weighs in favor of that statement's admission as an excited utterance.

non-constitutional error harmless if we can "say[] with fair assurance . . . that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).  The government bears the burden of establishing that it is "highly probable that the error at issue did not contribute to the verdict." *Gabramadhin*, 137 A.3d at 185 (internal quotation marks omitted).

Just as in *Gabramadhin*, where the declarant of the improperly admitted hearsay statement testified at trial, *see* 137 A.3d at 185, Mr. Mitchum testified for the government and related to the jury all the information he gave the 911 operator and more.  That said, the 911 call could be seen as "an erroneously admitted prior consistent statement," which had "the prejudicial effect of unfairly bolstering the witness's credibility," *Gabramadhin*, 137 A.3d at 185 (citing *Daye v. United States*, 733 A.2d 321, 327 (D.C. 1999)).  But, in this case, the admission of Mr. Mitchum's 911 phone call did not provide much (if any) bolstering for his more detailed trial court testimony about his encounter with Mr. Pelzer; indeed the only detail included in the call about the actual theft was Mr. Mitchum's statement, subsequently retracted, that Mr. Pelzer had "said" he had a weapon.  Far from bolstering Mr. Mitchum's testimony, this gave Mr. Pelzer a targeted point of

impeachment.[18]    Moreover, we consider the impact of Mr. Mitchum's hearsay statement in the context of the record as a whole, in particular, the recovery of Mr Mitchum's phone from Mr. Pelzer and Mr. Pelzer's difficult-to-credit explanation for this circumstance.[19]    Accordingly, we conclude that it is highly probable that the improperly admitted recording did not affect the verdict and, thus, does not constitute reversible error.

---

[18] Mr. Pelzer also argues for the first time on appeal that "the trial court was mistaken as to the weight to be given to the admitted 911 recorded call" and failed to instruct the jury as to how to properly consider this evidence.  The foundation for this argument is a bench conference wherein the trial court expressed momentary confusion that the 911 call, which it had already ruled was admissible as an excited utterance, could not be considered for the truth of the matter asserted because the statements contained therein were not "made under oath" and could only be considered as a prior inconsistent statement.  But thereafter, the trial court did not take steps to limit the jury's consideration of the 911 call in any way.

The trial court's inaction was appropriate because the trial court was mistaken that the out of court statement needed to be made under oath in order to be considered for the truth of the matter asserted; if a statement satisfies our criteria for excited utterances, it is, without more, admissible for its truth.  Accordingly, Mr. Pelzer cannot satisfy the first prong of our test for plain error, requiring that error occurred. *See Wheeler v. United States*, 930 A.2d 232, 242 (D.C. 2007) (citing *United States v. Olano*, 507 U.S. 725, 732–34 (1993)) ("[F]irst, there must be an error.").  To the contrary, had the court acted on its confusion and limited the jury's consideration of the 911 call, as Mr. Pelzer now argues it should have, *that* would have been error.

[19] To recap, Mr. Pelzer had approached Mr. Mitchum, a stranger to whom Mr. Pelzer had an apparent aversion and with whom he did not want to be seen, to borrow his new phone; Mr. Pelzer had walked ahead of Mr. Mitchum and Mr. Mitchum had compliantly followed him; but at some point, for no discernable reason, Mr. Mitchum had run away, abandoning his new phone with Mr. Pelzer.

## IV.    Other Claims of Error

Mr. Pelzer first argues that the trial court "committed reversible error when it allowed the government to play the videotaped statement [he made to the police] in the presence of the jur[y] for purposes of refreshing [Mr.] Pelzer's [recollection]."  We review evidentiary decisions by the trial court about "the substance, form, and quantum of evidence which is to be presented to a jury" for abuse of discretion.  *Rodriguez v. United States*, 915 A.2d 380, 385 (D.C. 2007). Here we discern no abuse of discretion, because the record does not support Mr. Pelzer's argument that the trial court permitted the government to play his videotaped statement in front of the jury to refresh his recollection.  Instead, after Mr. Pelzer indicated on cross examination that he could not remember what he had said to the police, the government asked to set up the video equipment, prompting an objection from defense counsel that the government could not refresh Mr. Pelzer's recollection by playing the video recording.  The government then clarified that it was not seeking to refresh Mr. Pelzer's recollection; it was seeking to impeach him.[20]  The court indicated, however, that the government had not yet

---

[20]    Although the prosecutor did not cite any case law, he was apparently relying on the theory that "a witness's prior statement is considered inconsistent with h[is] testimony if []he evades questions at trial by claiming a loss of

(continued…)

laid an adequate foundation for impeachment. The government then elicited additional testimony from Mr. Pelzer and, when it again sought to play the tape, defense counsel did not object. The government played ten separate snippets, each one following testimony from Mr. Pelzer indicating that he did not know or did not remember what he had told the police.[21]

Mr. Pelzer also argues that the trial court improperly instructed the jury about "change of appearance"[22] and "flight."[23] We review the trial court's decision to give these instructions for abuse of discretion. *Graham v. United States*, 12 A.3d 1159, 1166–67 (D.C. 2011) (quoting *Wheeler v. United States*, 930 A.2d 232, 238 (D.C. 2007)).

---

(…continued)
memory." *McRoy v. United States*, 106 A.3d 1051, 1055 (D.C. 2015) (citing *Diggs v. United States*, 28 A.3d 585, 594 (D.C. 2011)).

[21] Mr. Pelzer devotes his one-page argument to his factually-unsupported argument that the trial court improperly allowed the government to play his videotaped statement in front of the jury in order to refresh his recollection. He fails to develop a separate argument explaining why what the government actually did—impeaching him with snippets of this videotaped statement—was improper. Moreover, as noted above, he has not even given us the video recording, much less identified the statements made in that recording used as impeachment.

[22] Criminal Jury Instructions for the District of Columbia, No. 2.303 (5th ed. rev. 2015).

[23] Criminal Jury Instructions for the District of Columbia, No. 2.301 (5th ed. rev. 2015).

With regard to the "change of appearance" instruction, we find that there was sufficient evidence supporting the instruction. Specifically, Mr. Mitchum testified that Mr. Pelzer had been wearing a camouflage jacket over a hooded sweatshirt and blue jeans, but Officer Newberry testified that when he stopped Mr. Pelzer, the order of his clothing was reversed: he was wearing a hooded sweatshirt over a camouflage jacket and sweatpants over blue jeans. *See Scott v. United States*, 619 A.2d 917, 928 (D.C. 1993) (stating that the defendant "wearing a different jacket" from the jacket witnesses had recognized "permitted the jury to draw an inference . . . [of] awareness of guilt" (citing *District of Columbia v. M.M.*, 407 A.2d 698, 700 (D.C. 1979) (inferring guilt from suspects' switching jackets))).

We agree that the "flight" instruction, which we have previously "cautioned . . . should be used 'sparsely,'" *Headspeth v. United States*, 86 A.3d 559, 564 (D.C. 2014), had a weaker foundation.[24] But, assuming the trial court erred, such error

---

[24] This instruction is typically given when there is specific evidence that the defendant was attempting to flee from law enforcement. *See, e.g.*, *Headspeth*, 86 A.3d at 561–62 (discussing defendant's attempt to evade arrest by police), and we are unaware of any decision of this court indicating that the act of leaving the scene of a crime alone supports a flight instruction. *Cf. Graham v. United States*, 12 A.3d 1159, 1167 (D.C. 2011) ("A flight instruction is improper unless the evidence reasonably supports the inference that there was flight or concealment and that the

(continued…)

was harmless in light of the instruction given, which directed the jury not to impute any consciousness of guilt to the defendant from his flight unless it has first concluded that the evidence showed that the defendant had in fact fled. Criminal Jury Instructions for the District of Columbia, No. 2.301 (5th ed. rev. 2015). In this case, the only evidence of flight came from Mr. Mitchum. And if the jury had already credited Mr. Mitchum's account of his encounter with Mr. Pelzer (and thus discredited Mr. Pelzer's account), it seems highly probable that any inference of guilt from Mr. Pelzer's alleged "flight" did not affect the outcome of this case. *See Kotteakos*, 328 U.S. at 764–65.

For the reasons discussed above, Mr. Pelzer's conviction for robbery is

*Affirmed.*

---

(…continued)
defendant fled because of consciousness of guilt and actual guilt of the crime charged." (quoting *Scott v. United States*, 412 A.2d 364, 371 (D.C. 1980))).