*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-914

ARIK ADANI SIMS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-17480-12)

(Hon. Robert E. Morin, Trial Judge)

(Argued November 16, 2017                    Decided August 15, 2019)

*Gabriel Diaz*, Public Defender Service, with whom *Samia Fam* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Giovanni B. Di Maggio*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Kimberley Nielsen*, and *Jin Park*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

EASTERLY, *Associate Judge*: Our judicial system has a strong preference for live, sworn witness testimony. We want factfinders to hear from witnesses with

personal knowledge of the facts and we want those witnesses to be subject to cross-examination, one of "the greatest legal engine[s] ever invented for the discovery of truth." 5 WIGMORE, EVIDENCE § 1367 (J. Chadbourn rev. 1974). Thus, our default remains a rule *against* hearsay—an out-of-court statement offered for the truth of the matter asserted[1]—and, although we authorize its admission in certain, defined circumstances, we resist expansive interpretations of hearsay exceptions that would permit them to overtake the rule. In this case, we hold that two hearsay statements were erroneously admitted: one as a present sense impression, the other as an adoptive admission. Because we cannot say with fair assurance that the jury's verdict was not substantially influenced by the cumulative impact of these erroneously admitted hearsay statements, we reverse.

## I. Facts and Procedural History

In the early hours of September 30, 2012, police responded to reports of gunshots at a multi-unit apartment complex named the "Sheperd Building," located at 7436 Georgia Ave., Northwest. The police arrived at the scene to find Lamar Fonville on the sidewalk near the front, right corner of the building, bleeding from

---

[1] *Laumer v. United States*, 409 A.2d 190, 194 (D.C. 1979) (en banc); *see also* Fed. R. Evid. 801(c). *See generally* 2 MCCORMICK ON EVIDENCE § 246 (7th ed. 2016).

two gunshot wounds, one to his head, the other to his left forearm. Moments later, he was dead. Arik Sims was charged with his murder.

At trial, the government presented evidence that, in the hours before the shooting, Houston Brown hosted a "stripper party" in his apartment on the second floor of the Sheperd Building. By 2:00 a.m., the entertainment had ended and the remaining guests, as many as 20–30 people, had moved outside to get some air. Among them were Mr. Fonville, government witness Leslie Isaac, and, according to Mr. Isaac, Mr. Sims.

Mr. Isaac, 61 years old at the time of trial, was the government's sole eyewitness to the shooting to testify at trial. He attended the party, and after about three or four hours, he and Mr. Fonville ended up sitting outside on a set of steps that connect Georgia Avenue to a paved walkway between the Sheperd Building and the neighboring apartment complex. Mr. Isaac was "feeling pretty good," having had "about four" beers. Mr. Sims joined them and they all had a "pleasing conversation." After "five to ten minutes[,] [o]r maybe more," Mr. Sims walked away; he returned ten to fifteen minutes later and the three men resumed talking, "laughing and joking." At this point, Mr. Sims loudly exclaimed, "look at that

girl." Mr. Isaac and Mr. Fonville looked in the direction Mr. Sims had indicated.[2] Mr. Sims then pulled a gun from his waistband,[3] shot Mr. Fonville once in the back of the head, and fired three or four shots altogether. Mr. Isaac "jumped up" and ran, but he testified that he happened to turn around just in time to see Mr. Sims (who was running in the opposite direction) drop his gun on the sidewalk, double back, grab the gun, and escape into a waiting vehicle.

Mr. Isaac was questioned by the police in the early morning hours after the shooting. He initially told them that he had not seen anything. But his story changed during the course of his interview, which he said lasted "all night long." By the time the interview ended, he claimed that he had seen the shooting and that he had seen the shooter once before. He said he did not know the shooter's name but had been told by Mr. Fonville that his name was Arik. By the time of trial, Mr. Isaac's story had evolved further: He claimed that he had a long-standing friendship with Mr. Sims, who was almost four decades his junior, dating back to

---

[2] In contrast to his trial testimony, in his testimony before the Grand Jury, Mr. Isaac did not mention Mr. Sims's exclamation or his and Mr. Fonville's reaction; instead, he testified that he did not remember what they were talking about just before Mr. Sims shot Mr. Fonville.

[3] Mr. Isaac testified both that, when he looked back at Mr. Sims, Mr. Sims already "had the gun to [Mr. Fonville's] head and [was] beginning to . . . unload it," and that he turned back in time to see Mr. Sims pull the gun from his waistband and even "felt [Mr. Sims's] body movement" as he pulled out the gun.

the summer of 2011 when Mr. Sims visited his apartment daily to play video games with Mr. Fonville, but this testimony was discredited.[4]

Government witness Jawanza Setepenra was also at the scene that night but did not see the shooting. He testified that he, Mr. Sims, and Devin Myers had been drinking vodka at Mr. Myers's house and drove to the party together. They arrived late. He was unable to give a precise time, but he thought it was "close to midnight." They parked outside the Sheperd Building. Mr. Setepenra, who by this time was intoxicated, left Mr. Sims and Mr. Myers outside and went up to Mr. Brown's apartment. There was one other man there. Mr. Setepenra did not know him, but they chatted and watched television together. Mr. Setepenra estimated that he had been inside between twenty to forty-five minutes when he heard gunfire.[5] The other man ran out of the apartment. Mr. Setepenra "paused for a

---

[4] Mr. Isaac was impeached with the fact that he was incarcerated from May 20, 2011, to November 2011. Mr. Isaac then asserted that Mr. Sims had visited his apartment earlier in the year. But that assertion was called into question by evidence elicited by the government that Mr. Sims was out of the District from August 2008 until June 2011.

[5] Mr. Setepenra's estimate of the time he spent in Mr. Brown's apartment did not align with his testimony that he went straight up to Mr. Brown's apartment after he and his friends arrived at the party close to midnight and testimony that the first responders received a report of the shooting around 2:30 a.m.

minute" and then, with some additional stops and starts, *see infra* note 12, proceeded downstairs.

Once out on the street, Mr. Setepenra saw three men (including his television-watching companion), all in their early to mid-twenties, standing near Mr. Fonville's body. He did not see Mr. Sims or the car they had driven to the party. During the next eight minutes, Mr. Setepenra called 911 three times to assist Mr. Fonville, who was still breathing. He explained that he made multiple calls because it seemed like the operator "didn't comprehend what [he] was saying, so [he] hung up" and called back.

Overruling an objection by defense counsel, the court allowed the government to ask Mr. Setepenra if he heard someone "state the description of the person who made this happen." Mr. Setepenra testified that, while he was on the phone trying to speak to 911, "[s]omeone said it was the fat-face, light-skinned dude." The government then asked if he "hear[d] this person also state a name attached to that description"; he testified, "Yes[,] . . . Arik." It is unclear where Mr. Setepenra was when he heard this statement. He testified that, when he exited the Sheperd Building, he walked over to Mr. Fonville and then back to the front steps of the building. He did not identify the speaker as one of the three people he

saw standing around Mr. Fonville. In response to the government's questioning, Mr. Setepenra testified that he did not know the speaker. He was not asked to provide any other identifying information regarding this person. Mr. Setepenra testified that he did not relay the unknown declarant's statement to the police when he was interviewed "right after this incident." He explained, "I c[ould]n't say that he [Arik] did it because somebody else said he did it."

Government witness Geoffrey Adams, a friend of Mr. Sims since childhood, also did not see the shooting (he had been at work), but he was living with Mr. Sims and Mr. Sims's mother in their home at the time of Mr. Fonville's death. Mr. Adams testified that, after homicide detectives interviewed Mr. Sims, he met Mr. Sims at the house at Mr. Sims's request. Mr. Sims's friend Devin Myers was also present at this meeting. According to Mr. Adams, during this meeting, Mr. Sims confessed to shooting Mr. Fonville[6] and asked Mr. Adams to provide him with an

---

[6] According to Mr. Adams, Mr. Sims said that he walked up to Mr. Fonville, "dapped [him] up" (meaning Mr. Sims gave Mr. Fonville "a handshake"), and then immediately shot him, "empt[ying] the clip," (i.e., firing all the bullets in the magazine). After the prosecutor refreshed Mr. Adams's memory with his grand jury testimony, Mr. Adams added that as Mr. Sims greeted Mr. Fonville, Mr. Sims admonished him, "'really, my mom's house, really, and that's when [Mr. Sims] shot him." The government argued in its opening statement that this was a reference to a 2011 burglary of Mr. Sims's mother's home and introduced the 911 call of the break-in as an exhibit.

alibi.[7]  Mr. Adams testified that, during this conversation, Mr. Myers interjected that Mr. Sims had dropped the gun's magazine, or clip, as he fled the scene and had to run back to pick it up before getting into a waiting car.  At trial, Mr. Adams could not remember Mr. Sims's reaction to Mr. Myers's alleged statement.[8]

In addition to the directly inculpatory evidence from this trio of witnesses—Mr. Isaac, Mr. Setepenra, and Mr. Adams—the government presented circumstantial evidence.  Most notably, it offered testimony from the medical examiner and physical evidence recovered from the crime scene, including shell casings and unfired bullets—which could have fallen out of a dropped gun or magazine—none of which directly tied Mr. Sims to the crime.

Mr. Sims testified in his own defense.  Although he admitted he had been at the party, he asserted that he returned home around 12:30 a.m. to give tattoos to a few individuals and to give his mother a dose of her medicine (an injection), which she was required to take nightly at 2:00 a.m.  One of his customers and his mother

---

[7]  The government presented testimony from Kalilah Speaks, a young woman Mr. Sims had been dating, that he had also asked her to provide him with an alibi.

[8]  Mr. Myers was called as a witness by Mr. Sims but invoked his Fifth Amendment privilege and did not testify.

testified for Mr. Sims and generally corroborated this story. In addition, Mr. Sims called as witnesses three individuals who were at the Sheperd Building at the time of the shooting, all of whom testified that the shooter's height, weight, and hairstyle did not match Mr. Sims.

The jury found Mr. Sims guilty on all counts. This appeal followed.

## II. Hearsay

### A. Admission of Hearsay as a Present Sense Impression

Mr. Sims first argues that the trial court reversibly erred in permitting the government to put into evidence, through Mr. Setepenra's testimony, the hearsay statement made by an unknown declarant, "it was the fat-face, light-skinned dude[,] . . . Arik," as a present sense impression. When confronted with a hearsay statement, a trial court "has the legal responsibility to examine the testimony and determine whether [a] proper foundation has been laid" to admit the testimony under an exception to the rule against hearsay. *Mayhand v. United States*, 127 A.3d 1198, 1205 (D.C. 2015) (internal quotation marks omitted). "We commit this decision to the trial court's exercise of sound judicial discretion," *id*. (internal

quotation marks omitted), which, as we explained in *Mayhand*, means "we review the trial court's fact-finding for clear error, and we review the court's determination that these facts permit admission of a statement under the [asserted hearsay] exception for abuse of discretion." *Id*. "Obviously, whether the trial court adheres to the test for the admission of hearsay under [an] exception is a legal question and the trial court abuses its discretion when it rests its conclusions on incorrect legal standards." *Id*. (internal quotation marks omitted).

This court recognized the admissibility of certain hearsay statements under the present sense impression exception in *Hallums v. United States*, 841 A.2d 1270, 1276 (D.C. 2004) (authorizing the admission of a hearsay statement "describing or explaining events which the declarant is observing at the time he or she makes the declaration or immediately thereafter"). We stressed that, to qualify for admission as a present sense impression, proof that the statement was made "contemporaneously with the events described" would be essential because this is a foundational justification for the reliability of hearsay proffered under this exception. *Id*. at 1277–78; *see also id*. at 1277 (noting that "[t]he classic present sense impression relates contemporaneous events or conditions as they are perceived by the observer's senses"); *accord United States v. Green*, 556 F.3d 151, 155 (3d Cir. 2009) (explaining that "[t]he fundamental premise behind this hearsay

exception is that substantial contemporaneity of event and statement minimizes unreliability" and thus that "the time requirement . . . is strict") (internal quotation marks omitted).[9]  We further stressed "that care must be taken to ensure that this exception is not used to admit statements that circumstances reveal were not truly spontaneous, but instead involved conscious reflection[,] . . . recall from memory," or even "intentional deception"—again to ensure reliability.  *Hallums*, 841 A.2d at 1277 (internal quotation marks omitted).

In addition to contemporaneity and spontaneity, we made clear that a trial court must be assured that the declarant of the hearsay statement personally perceived the event described.  *Id.* at 1276 (defining a present sense impression as a "statement[] describing or explaining events *which the declarant is observing* at the time he or she makes the declaration or immediately thereafter" (emphasis added)); *see also Bemis v. Edwards*, 45 F.3d 1369, 1373 (9th Cir. 1995) (explaining that, per pertinent federal rules of evidence, a declarant of hearsay sought to be admitted as a present sense impression "must . . . have personal knowledge of what she describes"); *accord Ginyard v. United States*, 816 A.2d 21,

---

[9]  We did not hold in *Hallums* that we were adopting the conception of the "present sense impression" exception to the rule against hearsay embodied in Federal Rule of Evidence 803, but we looked to the federal rule and federal case law as persuasive authority.  841 A.2d at 1275–78.

40 (D.C. 2003) (explaining that "[j]ust as testifying witnesses must have personal knowledge of the subject of their testimony, hearsay declarants must have personal knowledge of what they assert in order for their declarations to be admissible" (citation omitted)); *Miller v. Keating*, 754 F.2d 507, 511 (3d Cir. 1985) ("[A] witness may not testify about a subject without personal knowledge. This rule applies with equal force to hearsay statements.") (citation omitted).

The proponent of proffered hearsay bears the burden of justifying its admission under a specific exception to the rule against hearsay. *Gabramadhin v. United States*, 137 A.3d 178, 187 (D.C. 2016). In the context of the excited utterance exception, we have said that the burden of proof is a preponderance of the evidence. *United States v. Woodfolk*, 656 A.2d 1145, 1150 n.14 (D.C. 1995); *accord Miller*, 754 F.2d at 511. The parties both argue that the same burden of proof applies for the admission of hearsay under the present sense impression exception. In light of the common origin of the present sense impression and excited utterance hearsay exceptions,[10] we agree and now hold that all

---

[10] *See Burgess v. United States*, 608 A.2d 733, 738 (D.C. 1992) (Rogers, C.J., concurring) (explaining that the present sense impression exception to the rule against hearsay was, like the excited utterance exception, "one of the four hearsay exceptions encompassed by the ancient term *res gestae*" and that the foundation for the trustworthiness of statements admitted under all of these exceptions was that they possessed "a degree of spontaneity").

requirements of the present sense impression exception to the rule against hearsay must be established by a preponderance of the evidence. *See Woodfolk*, 656 A.2d at 1150 n.14 (noting that "[p]reponderance of the evidence is the most commonly accepted standard in determining the admissibility of evidence" (citing 1 MCCORMICK ON EVIDENCE § 53 n.8 (4th ed. 1992))); *see also Bemis*, 45 F.3d at 1373 (explaining that personal perception for present sense impression must be established by a preponderance of the evidence).

Our inquiry is fact-specific. *Cf. Simmons v. United States*, 945 A.2d 1183, 1187 (D.C. 2008). Here, the government proffered that an unidentified declarant said, "it was the fat-face, light-skinned dude[,] . . . Arik," "[m]aybe a minute or seconds" after the shooting and inferably was providing an eyewitness description of "the person who shot the victim." But the government's evidence did not substantiate its proffer. In particular, neither the testimony of Mr. Setepenra nor any other government witness established by a preponderance of the evidence that the unidentified declarant had seen the shooting and spoke from personal knowledge.[11] *See id.* at 1188 (acknowledging that "the burden of demonstrating

---

[11] Mr. Sims did not renew his objection to this hearsay statement after Mr. Setepenra testified. *See Jones v. United States*, 127 A.3d 1173, 1187 (D.C. 2015). The government, however, has not argued in its brief that Mr. Sims's present sense impression claim was unpreserved and it expressly disclaimed a preservation

(continued…)

the declarant's personal knowledge of the event . . . naturally becomes more difficult to meet when the declarant is unknown"); *Gainer v. Wal-Mart Stores E., L.P.*, 933 F. Supp. 2d 920, 929–30 (E.D. Mich. 2013) (internal quotation marks omitted) (observing courts are "hesitant" to admit the hearsay statements of unidentified declarants that "can neither be substantiated nor attacked").

There is no direct evidence in the record that the unidentified declarant saw the shooting. Mr. Setepenra did not know if this was the case because he himself was not present. The shooting occurred while Mr. Setepenra was watching television in Mr. Brown's second-floor apartment, and some amount of time passed before he was outside and in a position to hear the proffered hearsay statement.[12] Conversely, the government's only eyewitness was not there when

---

(…continued)

challenge at oral argument. Instead, the government contends that the totality of Mr. Setepenra's testimony supports a determination that the statement recounted by Mr. Setepenra qualified as a present sense impression by a preponderance of the evidence. In the alternative, it argues that any error was harmless. Thus, we conclude that, as to preservation, the government has "waived the waiver," *see Wilson-Bey v. United States* (*Wilson-Bey II*), 903 A.2d 818, 829 n.22 (D.C. 2006) (en banc); *In re T.L.*, 859 A.2d 1087, 1090 n.6 (D.C. 2004), and we examine in the first instance whether Mr. Setepenra's testimony was legally sufficient to permit a determination by a preponderance of the evidence that the declarant had personal knowledge.

[12] How much time had passed is unclear because Mr. Setepenra's various time estimates at trial were imprecise and difficult to reconcile. Mr. Setepenra

(continued…)

Mr. Setepenra emerged from Mr. Brown's apartment and thus similarly had no way of knowing if the unidentified declarant saw the shooting.

The record lacks not only any direct evidence that the declarant spoke from personal knowledge, but also sufficient circumstantial evidence from which it reasonably could be inferred that the unknown declarant more likely than not witnessed the shooting. *Cf. Miller*, 754 F.2d at 511 (acknowledging that "[d]irect proof of perception, or proof that forecloses all speculation is not required" to

---

(…continued)

testified that, upon hearing the gunfire, the man with whom he had been watching television ran outside, whereas he "paused" before he proceeded downstairs— either "for a minute" (his testimony on direct) or "[f]or a few seconds" (his testimony on cross-examination). He confusingly stated that he was "[i]n a hurry, but taking [his] time at the same time," because he feared for his own safety. Regarding his descent downstairs, he similarly stated that he "kind of rushed, but took [his] time at the same time . . . because [he] didn't know exactly what was going on outside . . . and [he] didn't want to get into it too fast." He then estimated that it took him only ten seconds to travel downstairs from the apartment to the front door of the Sheperd Building, but also that it took him "about a minute to get . . . outside." He further noted that he had to "stop" at the front door to allow a "guy" to enter the Sheperd Building, but this delayed him only "a second or two." Mr. Setepenra testified that he "paused" again at the front steps of the building. It was not until he walked across "the platform" (the extended front stoop of the apartment building) and down a few steps to the sidewalk that he saw Mr. Fonville, wounded, lying on the ground on the walkway that ran alongside the Sheperd Building, with several men standing around. At some point thereafter he heard the hearsay statement while he was on the phone calling 911. He made three calls to 911 over the course of eight minutes; he did not specify at what point during those calls he heard the unknown declarant utter the proffered hearsay statement.

satisfy the personal knowledge requirement for the admission of an excited utterance).

The government argues that in this case "[t]he declarant's proximity to the site of the shooting supports the inference that the declarant had been there when the shooting occurred." Although "proximity to the scene at the time of the incident" may "provide[] some circumstantial evidence of firsthand knowledge," *Bemis*, 45 F.3d at 1373, Mr. Sims is correct to caution that "[a]n unidentified declarant making a purported present-sense impression . . . will, almost by definition, be present at the scene of the event in its aftermath." Thus, the weight reasonably attributed to evidence of physical proximity must depend on the particular facts.[13] Here we conclude the declarant's proximity is deserving of little weight, in part because it is unknown on this record where the declarant was when the declarant made the proffered hearsay statement and thus inferentially unclear how "proximate" the declarant was to the shooting.[14] Mr. Setepenra heard the

---

[13] *See, e.g.*, *Bemis*, 45 F.3d at 1373–74 (acknowledging declarant's proximity to the scene, but concluding that proof of personal knowledge was nevertheless insufficient); *Miller*, 754 F.2d at 511 (same).

[14] By contrast, in *People v. Brown*, 637 N.Y.S.2d 127, 127 (App. Div. 1996), cited by the government, the declarant's location and ability to perceive the events described in the proffered hearsay statement was evident: the declarant was an "unidentified motorist, who was double-parked on the other side of the street

(continued…)

declarant speak while he was outside, on the phone with 911. But, as noted above, *see supra* note 12, his calls to 911 spanned eight minutes, and he testified that he moved from the front platform of the Sheperd Building over to Mr. Fonville who was lying in a walkway adjacent to the building,[15] and then back to the front of the Sheperd Building.

Uncertainty as to when the statement was made further diminishes our ability to infer the declarant had personal knowledge based on the declarant's supposed proximity to the scene of the shooting. The government argues that the "very short lapse of time [which] left little opportunity for rumors to spread" supports a "fair" inference "that someone who identified the shooter had actually seen the shooting." But based on this record, we cannot agree. Although it is not altogether clear how much time elapsed between the time of the shooting and the

---

(…continued)
from the complainant['s van]," and he "spontaneously" informed the complainant, "[s]omebody *just* broke in and took your handtruck out and went down Seventh Avenue. . . . [R]un and you will catch him."

[15] Mr. Setepenra testified that three men in their twenties were standing by Mr. Fonville, but Mr. Setepenra never identified any one of them as the declarant of the proffered hearsay statement. Inferably one of them might have been. But we would stray into the territory of speculation to conclude that this was more likely than not the case, particularly where Mr. Setepenra never testified that the area was otherwise deserted, and Mr. Isaac testified that just before the shooting, there were lots of people outside "moving all the way around."

time of the hearsay declaration, *see supra* note 12, manifestly there was ample time for people to move about and communicate. As noted above, both Mr. Setepenra and his television-watching companion had time to travel from Mr. Brown's second-floor apartment to the scene before the declarant spoke, but neither were eyewitnesses to the shooting.[16] Mr. Setepenra himself was seeking secondhand information from others as to "what happened." Under the circumstances, where multiple gunshots were fired at a party that had spilled out on the street and a wounded man lay on the ground, we think it unreasonable to assume that no one else was making similar inquiries and sharing information in this same window of time.

Lastly, the government looks to the wording of the statement itself—"it was the fat-face, light-skinned dude[,] . . . Arik"—and highlights that the declarant did not preface his statement with "I heard." Although the substance of a proffered hearsay statement may inform our assessment of its admissibility under a hearsay exception, *see Jenkins v. United States*, 80 A.3d 978, 996 n.45 (D.C. 2013), it does not do so in this case. Preliminarily, the government's wording of the hearsay statement is an amalgam of Mr. Setepenra's responses to two separate questions.

---

[16] At the same time, other people left the scene, including Mr. Isaac and the "guy" who entered the Sheperd Building as Mr. Setepenra was trying to exit.

The government never elicited testimony confirming these were the declarant's exact words. Even assuming they were, we note the "it was" formulation is neutral as to the declarant's source of information. Particularly when assessed in the context of the record facts, it does not favor a conclusion that the information was received by direct observation. Rather, it is entirely consistent with the report of information heard from others, *see, e.g.*, *Bemis*, 45 F.3d at 1374–75, or a "surmise."[17] 2 MCCORMICK ON EVIDENCE § 271 n.20 (7th ed. 2016) (citing *Brown v. Keane*, 355 F.3d 82, 89 (2d Cir. 2004)); *see, e.g.*, *Miller*, 754 F.2d at 511–12 (explaining, in a personal injury action arising out of a car accident, unidentified declarant's statement "the bastard tried to cut in" did not "proclaim" personal knowledge; the declarant "might have been hypothesizing or repeating what someone else had said"); *Gainer*, 933 F. Supp. 2d at 931 (explaining, in personal injury action arising out of a slip and fall, unidentified customers' statements "they were just mopping the [mother f--king] floor" provided "no personal knowledge foundation for the [c]ourt to conclude, by a preponderance of the evidence, that the

---

[17] The fact that the declarant gave some descriptive details and a name within an "it was" statement does not change our calculus.

declarants saw an employee [of the defendant] mop the floor" (first alteration in original)).[18]

In the absence of sufficient evidence to support a determination that the declarant possessed personal knowledge, the hearsay statement in question did not satisfy our test for a present sense impression and should not have been admitted

---

[18] We distinguish this case from *Simmons*, 945 A.2d 1183, where we concluded that a statement proffered as an excited utterance by the defense (identifying someone other than the defendant as the shooter) had been erroneously excluded. *Id.* at 1184. We said, in the context of evaluating whether there was a sufficient nexus between the elderly gentleman declarant's described agitation and the shooting, that it was "reasonable to infer that the declarant actually observed the shooting" based on evidence, which included "declarant's physical and temporal proximity to the shooting, his agitation, and his statement." *Id.* at 1188. For multiple reasons, we do not see any inconsistency with our assessment of the evidence of personal knowledge in *Simmons* and in this case. First, the factual fabric is different; most obviously, in *Simmons* there was evidence not present in this case that the declarant was in "considerable distress" as a result of observing the shooting. Second, we did not acknowledge or apply in *Simmons* the preponderance of the evidence standard applicable here. *See supra* 13-14. Third—and perhaps an explanation for why we did not focus on a precise burden of proof—we explained that the movant had made an uncontested proffer that the elderly gentleman declarant "*indicated that he just witnessed a shooting*," then pointed to the shooter and told the testifying witness "[t]here goes the guy that just shot that young man right there" and "he still has the gun." *Simmons*, 945 A.2d at 1186 (emphasis added). We held that that uncontested proffer alone was "a substantial evidentiary basis for concluding that the declarant spoke after personally observing the shooting and the man with the weapon." *Id.* at 1189.

into evidence.[19]  *Cf. Ginyard*, 816 A.2d at 40 (confirming the hearsay statement was properly excluded where there was no evidence that the declarant had personal knowledge of the subject of the statement).  To the extent the government suggests that it was nonetheless admissible as a present sense impression because "other, independent evidence showed that the statement was reliable," we disagree.  The government cites *People v. Jones*, 65 N.E.3d 699, 700 (N.Y. 2016), which explains that New York's present sense impression exception to the general rule against hearsay incorporates an additional corroboration requirement.  *Id.* (explaining that the present sense impression exception "allows the admission of 'spontaneous descriptions of events made substantially contemporaneously with the observations . . . *if* the descriptions are sufficiently corroborated by other evidence'" (emphasis added)).  Even if *Jones* were binding, it does not support an argument that other proof of reliability may substitute for satisfaction of the requisite present sense impression admission criteria.  Moreover, case law that does bind us, namely *Hallums*, points in the opposite direction.  After setting these admission criteria—spontaneity, contemporaneity, and personal knowledge—this court noted that other jurisdictions (like New York) have imposed a corroboration

---

[19]  Because we conclude this threshold criterion was not satisfied, we need not address the other requirements for the admission of a proffered hearsay statement as a present sense impression.

requirement as an "*additional* safeguard[]" to ensure the reliability of a hearsay statement. 841 A.2d at 1278 (alteration in original) (emphasis added) (citation omitted). We ultimately declined to "resolve whether to adopt any particular safeguards for evaluating the admissibility of present sense impressions" in this jurisdiction. *Id.* at 1279. But we gave no indication that the newly announced criteria for admission of hearsay as a present impression could simply be *bypassed* if the movant supplied adequate corroborating evidence of the substance of the statement.[20]

In any event, we are unpersuaded that there was other evidence in the record showing the reliability of the declarant's statement. The government highlights "independent testimony by [Mr.] Setepenra indicating that appellant was still in the area" at the time of the shooting, referring to his testimony that "[as] soon as [the shooting] happened, I knew that Devin [Myers] and Arik [Sims] was still outside."

---

[20] *Hallums* does not support the government's alternative argument that Mr. Sims's ability to cross-examine Mr. Setepenra gives sufficient assurances of the hearsay statement's reliability. The government incompletely quotes from our observation that "[t]he advisory committee's note [to Federal Rule of Evidence 803] . . . states that an additional assurance of reliability is that the in-court witness relaying the statement *had equal opportunity to observe and corroborate the existence of the event or condition* and may be cross-examined on the statement," 841 A.2d at 1276 (emphasis added); the government leaves out the italicized language. As detailed above, Mr. Setepenra did not have such an equal opportunity.

But Mr. Setepenra had no foundation for his purported knowledge of Mr. Sims's whereabouts. By this time, Mr. Setepenra had been up in Mr. Brown's apartment—by his own estimate for twenty to forty minutes, and likely much longer, *see supra* note 5—and he had no way of knowing whether Mr. Sims was still outside or whether he had left the party (as Mr. Sims testified he did).[21]

### III.    B. Admission of Hearsay as an Adoptive Admission

Mr. Sims also challenges the government's reliance at trial on Mr. Adams's testimony recounting an out-of-court statement by Mr. Myers detailing Mr. Sims's actions just after the shooting. Mr. Sims argues that this hearsay statement was improperly admitted as an adoptive admission. Because Mr. Sims did not object to the statement at trial, we review for plain error. *See, e.g.*, *Comford v. United States*, 947 A.2d 1181, 1189 (D.C. 2008) (reviewing an unpreserved challenge to hearsay admitted as a party admission under the four-part test for plain error). "Under the established four-part test for plain error, an appellant must demonstrate

---

[21] More probative but less helpful to the government is Mr. Setepenra's testimony that, when he exited the Sheperd Building, just before he heard the proffered hearsay statement, he did not see Mr. Sims or the car they drove to the party.

[*inter alia*] not merely that there was an error, but also that the error was 'clear' or 'obvious . . . .'" *Id.* We conclude that Mr. Sims has made such a showing.

"Testimony that an accused adopted statements of another person as his own may be admitted in evidence as an exception to the hearsay rule if it clearly appears that the accused understood and unambiguously assented to the statements." *Foreman v. United States*, 792 A.2d 1043, 1052 (D.C. 2002) (internal quotation marks omitted). To constitute an adoptive admission, "the statement must be made in the defendant's presence and hearing, . . . the defendant must actually understand what was said and have an opportunity to deny it," *id*. (internal quotation marks omitted), and the statement must "contain[] assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny," *Comford*, 947 A.2d at 1185 (internal quotation marks omitted).

Although Mr. Adams testified that Mr. Myers's hearsay statement—recounting how Mr. Sims dropped the magazine of his gun as he fled the scene of the shooting and had to run back to retrieve it—was made in Mr. Sims's presence, the government presented no evidence that Mr. Sims heard and understood the statement and had the opportunity to deny it. And as the government candidly acknowledges, "[t]he real problem is that [Mr.] Adams could not recall how [Mr.

Sims] responded to [Mr.] Myers's assertion about the magazine." Thus, the government does not contest Mr. Sims's assertions of error, or the plainness thereof, on appeal. *See Comford*, 947 A.2d at 1189 (identifying these as the first two prongs of the test for plain error). Instead, it argues that Mr. Sims cannot show that this error affected his substantial rights or that it "seriously affected the fairness, integrity or public reputation of the judicial proceeding." *Id.* at 1190 (identifying these as the third and fourth prongs of the test for plain error). It is unnecessary for us to assess whether this single claim of unpreserved error would necessitate reversal under our test for plain error, however, we conclude that the aggregate harm of the erroneous admission of both this hearsay statement as an adoptive admission and the other hearsay statement as a present sense impression, *see supra* Part II.A, requires reversal. *See infra* Part III.

## III. Harm

The remaining question is whether the erroneous admission of the hearsay statements discussed above—both nonconstitutional in nature—requires reversal. Generally, a nonconstitutional error is harmless if we can "say with fair assurance" that the error did not substantially sway the judgment. *Gabramadhin*, 137 A.3d at 185 (brackets omitted) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765

(1946)). "The standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the jury's verdict." *Smith v. United States*, 26 A.3d 248, 264 (D.C. 2011); *id.* at 265 n.12 (internal quotation marks omitted) (explaining that, when reviewing the cumulative impact of multiple errors, including unpreserved ones, the standard is *Kotteakos*, not plain error); *see also In re C.A.*, 186 A.3d 118, 126 (D.C. 2018) ("In assessing harm, we examine the trial court's two erroneous evidentiary rulings together.").

In this case we are unable to "say with fair assurance" that the erroneous admission of hearsay did not substantially sway the jury's verdict. *Gabramadhin*, 137 A.3d at 185 (brackets omitted) (internal quotation marks omitted). The government's case was not strong. Despite evidence that at least 20–30 people attended the party and many people were milling around outside at the time of the shooting, the government called only one eyewitness, Mr. Isaac, who was impeached on multiple fronts.

A drug user for decades, with eleven prior convictions and two pending cases, Mr. Isaac was paid $40 for each meeting he had with the prosecution at a time when he was experiencing homelessness. Moreover, Mr. Isaac's evolving

narrative of events became markedly more inculpatory, and detailed, over time. Mr. Isaac first told police he had not seen who shot Mr. Fonville. After being interviewed by the police for hours, he later said that he had seen the shooting but that he did not know the identity of the shooter. In the end, Mr. Isaac testified at trial that he was an arms-length away from Mr. Sims when Mr. Sims shot Mr. Fonville and that he had known Mr. Sims for years. (He claimed to have hosted Mr. Sims, almost four decades his junior, on multiple occasions in his apartment, including during times when either he or Mr. Sims were outside the District.). His trial testimony also contained never-before-mentioned embellishments. For example, he testified that Mr. Sims exclaimed as a diversion, "look at that girl," just before the shooting, and he impossibly asserted both that he had not turned his gaze back to Mr. Sims and Mr. Fonville until Mr. Sims had the gun pointed at Mr. Fonville's head and that he had seen and felt Mr. Sims draw the gun from his waistband, *see supra* note 3.

Even Mr. Isaac's explanation about the inconsistency of his narrative was inconsistent. At times, he appeared to acknowledge that, to the extent his memory appeared to improve with time, his account of the incident had been influenced by the questions that the police and prosecutors asked him. For example, he noted,

"sometimes, you could remember certain things by more questions people ask."[22]

At other times he maintained that his memory had not improved and that "[i]f I tell you I don't remember, I don't remember," even though he had told the Grand Jury that he did not remember certain details that he then purported to remember at trial almost two years later. *See supra* note 2.

Consequently, much of the government's case and summation focused on bolstering Mr. Isaac's credibility. The erroneously admitted hearsay was key to this effort.

---

[22] The phenomenon of an eyewitness incorporating post-event information into a narrative of an incident has been documented by psychologists who study how memory works and acknowledged by this court and others. *See Minor v. United States*, 57 A.3d 406, 421 n.11 (D.C. 2012) (acknowledging "science abundantly demonstrates the many vagaries of memory encoding, storage, and retrieval; the malleability of memory; [and] the contaminating effects of extrinsic information" (quoting *State v. Henderson*, 27 A.3d 872, 916 (N.J. 2011))); *Henderson*, 27 A.3d at 894 (explaining that "[r]esearch . . . has refuted the notion that memory is like a video recording"; instead "memory is a constructive, dynamic, and selective process" and "'the information ultimately offered as "memory" can be distorted, contaminated and even falsely imagined'"); *see generally* NATIONAL RESEARCH COUNCIL, IDENTIFYING THE CULPRIT: ASSESSING EYEWITNESS IDENTIFICATION 65 (2014) (explaining that "[t]he enduring plasticity of stored memories is a serious concern for the validity of eyewitness identification. A witness'[s] inevitable interactions with law enforcement and legal counsel . . . have the potential to significantly modify the witness'[s] memory of faces encountered and of other event details at the scene of the crime. Thus, the fidelity of retrieved events . . . is likely to be greater when retrieval occurs closer to the time of the witnessed events." (footnote omitted)).

The hearsay statement admitted through Mr. Setepenra—"[s]omeone said it was the fat-face, light-skinned dude[,] . . . Arik"—allowed the government to effectively introduce a second eyewitness to corroborate Mr. Isaac's identification of Mr. Sims as the shooter. Thus, the government argued to the jury in closing, "Leslie Isaac saw Arik Sims shoot Lamar Fonville in the back of his head. . . . *But you don't have to believe Mr. Isaac by himself. You heard from [Mr.] Setepenra*" (emphasis added). Moreover, in contrast to his ability to cross-examine Mr. Isaac, not only was Mr. Sims unable to cross-examine the unknown declarant, he could not cross-examine Mr. Setepenra about what the unknown declarant had actually observed, *see supra* note 20, because Mr. Setepenra was not present for the shooting and did not arrive at the scene until sometime later, *see supra* note 12. Because the hearsay statement relayed by Mr. Setepenra—with its damning but unverifiable identification of Mr. Sims—was shielded from adversarial testing and highlighted by the government, the jury may well have given it significant weight.

Similarly, the hearsay statement introduced through Mr. Adams—Mr. Myers's narration of Mr. Sims's post-shooting acts of dropping the gun's magazine and running back to retrieve it—allowed the government to effectively introduce another eyewitness to corroborate Mr. Isaac's account of Mr. Sims's flight from the scene. The government argued to the jury, "you heard Devin [Myers] in that

conversation describing about how Mr. Sims dropped the gun and had to go back to pick it up. *Just like how Mr. Isaac saw it that evening*" (emphasis added).[23] And whereas Mr. Myers, who was allegedly in the getaway car with Mr. Sims, likely would have been subject to withering cross-examination had he not exercised his Fifth Amendment privilege against self-incrimination, Mr. Adams, a father of two who works with at-risk youth, helped care for his best friend's ailing mother and testified in his National Guard uniform, was a much stronger conduit for Mr. Myers's statement.

The government nonetheless urges us to affirm, pointing us to other evidence in the case—in particular, the physical evidence, Mr. Sims's admission that he asked two people for alibis, and Mr. Sims's alleged confession to Mr. Adams. Although this carries the government over the sufficiency threshold, our inquiry "turns not on whether the other evidence presented at trial would be sufficient to establish guilt, but rather on whether it is 'highly probable' that the error[s] at issue did not contribute to the verdict," *Gabramadhin*, 137 A.3d at 185. Further, our focus is on the "combined effect [of these errors] against the strength

---

[23] In fact, Mr. Adams testified that Mr. Myers said that Mr. Sims dropped only the magazine, whereas Mr. Isaac testified that he saw Mr. Sims drop the entire gun.

of the prosecution's case." *Smith*, 26 A.3d at 264 (internal quotation marks omitted); *see also Andrews v. United States*, 922 A.2d 449, 459 (D.C. 2007) (explaining that, when assessing harm under *Kotteakos*, we look to the centrality of the error, the strength of the government's case, and any mitigation of the error).

None of the evidence to which the government directs our attention convinces us that it is "highly probable" that the erroneously admitted hearsay was immaterial to the jury's assessment of Mr. Sims's guilt. The physical evidence did not tie Mr. Sims to the murder weapon or place him at the scene of the crime. Mr. Sims's request for alibis was undoubtedly subject to a negative inference, but it was not without a benign explanation—Mr. Sims was scared to have any interaction with the police, did not want to be pressured to implicate others in criminal activity, and did not want to be pinned with a murder he did not commit.

Mr. Adams's testimony about Mr. Sims's alleged confession is perhaps the strongest evidence for the government, yet even that was subject to question. Critically, Mr. Adams's account that Mr. Sims told him that he "dapped Lamar up," admonished him—"really, my mom's house, really"—and then immediately shot him, *see supra* note 6, did not align with Mr. Isaac's account of the shooting: that Mr. Sims conversed with him and Mr. Fonville for five to ten minutes, walked

away for ten to fifteen minutes, returned to resume their friendly conversation, and then exclaimed, "look at that girl" just before shooting Mr. Fonville. Mr. Adams's testimony that Mr. Sims told him "he emptied the clip" was also inconsistent with the government's theory that the two unfired bullets it recovered from the sidewalk were from the gun or magazine that Mr. Sims dropped during his escape. Moreover, there was reason for the jury to believe that Mr. Adams felt pressured to conform his narrative to the government's theory of Mr. Sims's guilt. Mr. Adams was subject to a deferred sentencing agreement in connection with an assault charge; and, as the jury heard in a recording of the interrogation of Mr. Sims by the police, the lead detective told Mr. Sims that he would "f[—]k [Mr. Adams] up. . . . [and] ruin his career" with the National Guard if Mr. Adams did not cooperate with the investigation.

In short, when we examine all the evidence the government presented at trial, we cannot say the erroneously admitted hearsay was harmless. For the reasons set forth above, we reverse Mr. Sims's convictions and remand the case for further proceedings.

*So ordered.*